UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED

Ross Greene )
)
)
Plaintiff, )
)
- v. – )
)
J. Stuart Ablon, )
)
Defendant. )
)

DIST OF MASS.

Civil Action No. _____

## **VERIFIED COMPLAINT**

### **Introduction**

1.      This action arises from Stuart Ablon's misappropriation of Ross Greene's

intellectual property rights; his trademark and copyright infringement; his misdirection of

business opportunities, assets and property belonging to the Center for Collaborative Problem

Solving, Inc. – a corporation in which Mr. Greene is a fifty percent (50%) shareholder - to Mr.

Ablon for his financial benefit; his scheme to systematically deprive Ross Greene of the financial

and professional proceeds from the promotion and dissemination of property belonging

exclusively to Ross Greene; and from Ablon's fraudulent misrepresentation of Ross Greene's

model for diagnosing and treating behaviorally challenged children as his own. Ross Greene

brings this action for monetary damages and injunctive relief, to compensate him for the losses

caused by Ablon and to prevent further harm and damage to his intellectual property rights,

business interests, and professional reputation.

### **The Parties**

2.      Ross Greene, Ph.D. ("Dr. Greene") is an individual residing at 45 Mount Alvernia

Road, Newton, Massachusetts. He is a Director, fifty percent (50%) shareholder, and President

1

of the Center for Collaborative Problem Solving, Inc. ("CCPSI").

3.    Stuart Ablon, Ph.D. ("Dr. Ablon") is an individual who resides in Wellesley,

Massachusetts.  He is a Director, fifty percent (50%) shareholder, and the Treasurer of CCPSI.

Until his resignation on November 10, 2008, he was also an employee of CCPSI.

## Jurisdiction and Venue

4.    This Court has jurisdiction of this matter pursuant to 15 U.S.C. §§1116, and 1121

and 28 U.S.C. §§ 1331 and 1367.

5.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

## Background

### Dr. Greene and The Collaborative Problem Solving Approach

6.    Dr. Greene received his doctorate in clinical psychology from Virginia Polytechnic

Institute ("Virginia Tech") in 1989.  His pre-doctoral training included an internship at the

Children's National Medical Center, which is part of the George Washington University Medical

Center in Washington, D.C.  Dr. Greene remained at Virginia Tech after completing his

doctorate, becoming an adjunct professor of clinical psychology, where among other things, he

created and directed a clinic specializing in the assessment and treatment of children with

attention deficit/hyperactivity disorder ("ADHD"), and began, as a sole proprietor, providing

workshops on ADHD for parents, educators, and mental health clinicians.  He also began and

maintained a small private practice specializing in the treatment of children and families.

7.    For two years beginning in early 1992, Dr. Greene was an assistant professor and

staff psychologist in the Department of Psychiatry and Pediatrics at the University of

Massachusetts Medical Center.  At the same time, Dr. Greene, as a sole proprietor, expanded his

workshops and speaking engagements on ADHD and began speaking nationally about the

-2-

behavioral challenges, school difficulties, and social impairments associated with the disorder. The speaking engagements were conducted solely by Dr. Greene. Over time, Dr. Greene increasingly focused on the aggressive, explosive behaviors often manifested in children with ADHD, and included as part of his presentations a description of the innovative psychosocial treatment model he developed to treat such behaviors. He began extending his model to other clinical populations, including youth diagnosed with oppositional defiant disorder ("ODD"), conduct disorder ("CD"), mood disorders including depression and bipolar disorder, and autism spectrum disorders, such as non-verbal learning disability and Asperger's disorder.

8.      In or about 1993, Dr. Greene created the treatment model that became known as the Collaborative Problem Solving Approach (the "CPSA"), a term created by Dr. Greene to designate his particular model. The CPSA resulted from an aggregation of Dr. Greene's education, training and clinical experience. The CPSA, as originally designed by Dr. Greene and as applied today, includes a variety of innovative approaches to children with behavioral disorders, including but not limited to employing a combination of empathy, problem identification and problem solving that involves the child and adult caregivers in ways that understand and incorporate the unique limitations of children with ADHD and the other disorders to which the CPSA applies.

9.      In July 1993, Dr. Greene had become an instructor and researcher at Harvard Medical School. He also began working part-time at Massachusetts General Hospital ("MGH"), providing outpatient therapy services, primarily for children. In addition, Dr. Greene opened a private therapy practice in which he treated children with social, emotional, and behavioral challenges, and their families, using the CPSA.   Dr. Greene's private practice, which continues to this day, was and remains unaffiliated with any medical or educational institution.

-3-

10.    In 1996, Dr. Greene received funding from the United States Department of
Education to study student-teacher compatibility at the University of Massachusetts/Boston's
Center for Social Development and Education ("UMB"). The proceeds from this grant were
paid to UMB and distributed to Dr. Greene for salary and expenses.

### *Dr. Greene, the CPSA and "The Explosive Child"*

11.    By 1996, Dr. Greene's workshops began focusing almost exclusively on his novel
conceptualization of children with social, emotional, and behavioral challenges and the CPSA
treatment approach. Dr. Greene also continued to use and refine the CPSA in his private practice
and in the workshops he presented.

12.    Believing that the CPSA presented an opportunity to assist, on a wider scale,
parents and educators of children with social, emotional, and behavioral challenges, as well as
the practitioners treating those children, Dr. Greene decided to write his first book about his
method. On or about January 29, 1997, Dr, Greene signed a book publishing contract with
Harper Collins publishers for the publication of a book to be called *The Explosive Child: A New
Approach for Understanding and Parenting Easily Frustrated, Chronically Inflexible Children
("The Explosive Child")*. The anticipated and eventual content of the book included a
description of the cognitive skills often found to be absent in challenging children, an
explanation of why standard behavior management strategies may be ineffective in reducing
their challenging behaviors, and a description of how to implement the CPSA.

13.    The first manuscript of *The Explosive Child* was completed in or about early
1998. On January 20, 1998, Dr. Greene registered the domain name "explosivechild.com,"
identifying himself as the registrant/owner, of the domain. Coinciding with the release of the
book in the fall of 1998, Dr. Greene launched his website at "explosivechild.com". The web site

-4-

included content from the book, and promoted itself as a site where parents and educators who were interested in the book and the CPSA could learn more about both.

14.     *The Explosive Child* was published on September 4, 1998. On October 5, 1998, the copyright for *The Explosive Child* was registered with the U.S. Copyright Office. It listed Dr. Greene as the sole author and owner of the copyright.

15.     Following the publishing of *The Explosive Child,* Dr. Greene made dozens of media appearances, including appearances on The Oprah Show, DatelineNBC and Good Morning America, to discuss and promote *The Explosive Child* and the CPSA. He continued his national and international speaking engagements, and published several scholarly papers on the CPSA. A second edition of *The Explosive Child* was published on December 27, 2000, and a third edition on September 1, 2005; both revised editions contained various updates to the CPSA model, all of them developed by Dr. Greene. A fourth and further updated edition is due to be published later in 2009. Dr. Greene was and remains the sole author of the revised editions, which were and will be copyrighted in Dr. Greene's name alone.

16.     In connection with his promotion and use of the book and the CPSA, Dr. Greene prepared and filed an application on October 10, 2001 to register the name "Collaborative Problem Solving Approach" as a service mark in the Supplemental Register of the U.S. Patent and Trademark Office ("USPTO"). The service mark was registered in the Supplemental Register, identifying Dr. Greene as the owner, on July 9, 2002. On February 15, 2008, Dr. Greene prepared and filed applications to register the names "Collaborative Problem Solving" and the "Collaborative Problem Solving Approach" in the Principal Register of the USPTO (collectively the "Greene Marks").

-5-

*Dr. Greene, Dr. Ablon and The Center For Collaborative Problem Solving, Inc.*

17.     By the late 1990s, Dr. Greene was spending an average of one day per week speaking on the topic of treating challenging children and the CPSA, using the model in his treatment of children and families in his private practice, and training psychiatry residents and psychology interns in the model in his supervisory duties at MGH.

18.     Dr. Greene's first contact with Dr. Ablon occurred in 1998 when Dr. Ablon was a trainee in the psychology internship program at MGH and Dr. Greene was one of his supervisors. MGH fostered an institutional culture in which more senior practitioners were expected to assist less senior members in the development of their professional careers. This culture was particularly evidenced in the Department of Psychiatry at MGH.

19.     As a trainee, Dr. Ablon demonstrated interest in and enthusiasm for the CPSA and inquired about the possibility of working more closely with Dr. Greene. Consistent with both academic tradition and the prevailing culture at MGH, he began mentoring Dr. Ablon more closely and providing substantial assistance in helping Dr. Ablon to develop his professional career. In order to render Dr. Ablon's interest in the CPSA more viable, Dr. Greene also began to include Dr. Ablon in substantial and lucrative professional opportunities which Dr. Ablon could not develop independently. These opportunities involved and were associated with Dr. Greene's work in disseminating the CPSA. Dr. Ablon initially expressed gratitude for the mentoring and opportunities Dr. Greene was generously providing. He acknowledged that the CPSA was Dr. Greene's work, that Dr. Greene possessed numerous copyrights, trademarks, and other intellectual property rights and legal interests in trademarks, creative works, and business opportunities he had by that time spent years developing, and agreed to work with Dr. Greene to assist him in disseminating the CPSA to its relevant constituencies.

20.     Over time, Dr. Greene and Dr. Ablon developed a business relationship focused upon and directed at dissemination of the CPSA, through research and publication of studies and scholarly articles. media and promotional appearances, book publication, and conducting workshops and seminars.  Dissemination of the CPSA also included work funded by grants and implementation of the model in specific public settings, including schools and school systems. Entities contracting for implementation of the model in these institutional settings would pay directly for the work.

21.     The business relationship between Dr. Greene and Dr. Ablon was founded upon the facts that Dr. Greene had conceived of and created the CPSA, that the CPSA concept was articulated in *The Explosive Child*, and that Dr. Greene owned and controlled all the intellectual property rights associated with his creation.  Because Dr. Greene created the CPSA, only Dr. Greene was competent and qualified to modify and develop it.  Dr. Ablon's professional role would be limited to essentially that of a junior colleague, taking direction from Dr. Greene with respect to, among other things, research involving the CPSA, application of the CPSA to particular contexts, the content of any training seminars or workshops involving the CPSA, the use of any seminar or workshop materials involving the CPSA, and any representations to be made regarding the CPSA itself.  Dr. Ablon was delegated certain responsibilities with respect to the dissemination of the CPSA and  for that work received a share in the revenue, income, and professional recognition that resulted from the successful dissemination of the model.

22.     The relationship never included any reasonable expectation that Dr. Ablon would someday share equally in all the intellectual property rights, business interests and professional notoriety associated with the CPSA or that he would ever become qualified to develop, modify, or interpret the model on his own.  Dr. Ablon's relationship with Dr. Greene created far more

opportunities than Dr. Ablon otherwise would have had and he enthusiastically accepted his defined role in the relationship, at first.

23.    In order to help Dr. Ablon develop his own practice, Dr. Greene invited Dr. Ablon to begin treating patients who had been referred to Dr. Greene in an independent private practice housed in the same office suite as Dr. Greene's in Wayland, Massachusetts. Over time, Dr. Ablon became more interested in assisting Dr. Greene in his work disseminating the CPSA. Dr. Greene agreed to include Dr. Ablon in this work and began providing referrals to Dr. Ablon for speaking engagements. Dr Greene also began instructing Dr. Ablon in the presentation of workshops on various aspects of the CPSA and began permitting Dr. Ablon to conduct workshops. In connection with these speaking engagements Dr. Greene provided Dr. Ablon with many workshop materials, including but not limited to PowerPoint slides and workshop handouts. At the time Dr. Greene provided these materials to Dr. Ablon, there was no question that the content was substantially derived from Dr. Greene's copywritten works, including but not limited to *The Explosive Child*, and that Dr. Greene was only providing those materials to Dr. Ablon as part of his agreed upon work, approved by Dr. Greene in advance, in disseminating the CPSA. It was also understood that provision of these materials did not constitute the assignment, transfer or impairment of Dr. Greene's trademark, copyright or other intellectual property rights.

24.    In 1997, Dr. Greene and two business partners formed a corporation called Blue Moon Seminars. The purpose of this corporation was to sponsor Dr. Greene and other speakers in workshops throughout North America. In 2001, in response to a significant demand for more intensive training in the CPSA, Blue Moon Seminars sponsored its first advanced training series on the CPSA, and Dr. Greene invited Dr. Ablon to participate. Dr. Greene was responsible for all of the content of this advanced training and oversaw the format of the training.

25.    Dr. Greene also conceived of a variety of assessment materials and instruments for use in the application of the CPSA. These materials, including but not limited to the *Pathways Inventory* and the *CPS Plan*, were reduced to writing by Dr. Greene and he obtained then and retains now all copyrights to those materials (the "Greene CPSA Materials").

26.    In early 2002, Dr. Greene decided to write a book describing the CPSA for mental health professionals. The book was to be based on the concepts expressed in *The Explosive Child* and would include portions of that text, with some modifications to accommodate and focus upon the professionals to whom it would be directed. Dr. Greene invited Dr. Ablon to assist with this new book. Dr. Ablon represented to Dr. Greene that he had the writing talent, the dedication, and the skill necessary to make a substantial contribution to the book. He acknowledged that his contribution would be based upon and derivative of Dr. Greene's work in developing the CPSA and as described in *The Explosive Child* and that Dr. Greene would at all times retain his copyright interests and all other proprietary rights in all his other works, creations, materials, and treatment models. Believing that Dr. Ablon would make substantive contributions to the new work and further relying on Dr. Ablon's acknowledgement that the content of this book would be based upon and entirely derivative of Dr. Greene's earlier copywritten work, Dr. Greene agreed to have the publisher of this book list Dr. Ablon as a co-author. They further agreed to evenly divide the royalties from this book.

27.    On or about April 17, 2002, Drs. Greene and Dr. Ablon signed a publishing contract with Guilford Publications (the "Guilford Contract" and "Guilford", respectively) for a book to be entitled *Treating Explosive Kids: The Collaborative Problem Solving Approach* (*"Treating Explosive Kids"*). Guilford drafted the contract listing Dr. Greene and Dr. Ablon as co-authors.

-9-

28.     His representations to the contrary notwithstanding, Dr. Ablon proved entirely

unable to meaningfully participate in the drafting of *Treating Explosive Kids*. After significant

delay, Dr. Ablon, rather than delivering an acceptable manuscript, delivered to Dr. Greene an

"attempt" at only one chapter.  Dr. Greene reviewed the submission and sent it to the agent in

New York who represented him and Dr. Ablon and who assisted them with the Guilford

Contract.  The agent called Dr. Greene and informed him that Dr. Ablon's work was so far below

an acceptable standard for a work of this type, so poorly written, and so clearly inadequate that

the book would not and could not be published if he remained significantly involved.  She said to

Dr. Greene "YOU have to write this book."

29.     Indeed, the draft provided by Dr. Ablon was poorly written, lacked focus, and did

not accurately represent the CPSA.  Worse still, it was clear that Dr. Ablon entirely

misrepresented to Dr. Greene his skill level, his dedication to the project, and that he possessed

the experience necessary to contribute to the project.  The submission established that Dr. Ablon

did not have the writing skills, focus or dedication necessary to contribute to the project and that

he was and would continue to be unable to contribute.  Dr. Greene discarded most of Dr. Ablon's

work and thereafter to write the book himself.  Dr. Greene, as the sole contact with the editor at

Guilford, oversaw all editorial revisions and was solely responsible for the revisions to the book.

Dr. Ablon made no additional contributions to this work after his initial submission.

30.     By the time *Treating Explosive Kids* was published on October 18, 2005, Dr.

Ablon's actual contribution to the work was less than fifteen pages in a work of 226 pages of

text.  Had Dr. Ablon truthfully disclosed his skill limitations and the fact that he could not or

would not be devoting the time and effort necessary to make a viable and substantive

contribution to the work to Dr. Greene, Dr. Greene would not have co-authored the book with Dr. Ablon or registered Dr. Ablon as co-owner of the copyright of the work.

31.     The book actually published by Guilford was entirely different than the one Guilford, Dr. Greene, and Dr. Ablon agreed to write and publish at the time the Guilford Contract was signed. The work as originally conceived was anticipated to be a genuine work of co-authorship by Drs. Greene and Ablon. The work that was actually published was authored solely and exclusively by Dr. Greene, with, at best, a *de minimis* "contribution" by Dr. Ablon.

32.     In August 2002, Drs. Greene and Ablon formed CPS Clinic, Inc. (the "CPS Clinic"), as the entity through and under which they would operate a growing therapy practice and organize and promote the CPSA. Although not reflective of their relative contributions of intellectual property and income to Clinic, Dr. Greene agreed to split the allocation of stock in this entity equally and to permit Dr. Ablon to be a Director. Dr. Greene also agreed that Dr. Ablon would be the Treasurer and Clerk of the corporation. After CPS Clinic was formed, Dr. Greene began re-directing the income from his private practice to CPS Clinic. Dr. Ablon agreed to do so as well.

33.     On January 15, 2003, Drs. Greene and Ablon agreed to operate a newly formed non-profit program called the Collaborative Problem Solving Institute (the "Institute") within MGH's Department of Psychiatry. The Institute was created administratively within MGH but was never formally organized. The goals of the Institute were never formally articulated beyond the fact that it would assist, as Drs. Greene and Ablon working together saw fit, in disseminating the CPSA. The Institute was neither funded nor operated by MGH and there was no written agreement between MGH and Drs. Greene and Ablon regarding their participation in or the

-11-

activities of the Institute. A small start up loan from MGH to the Institute was quickly and completely repaid with Dr. Greene's personal funds.

34.     On January 23, 2003, the Center for Collaborative Problem Solving, Inc. ("CCPSI") was formed by Drs. Greene and Ablon and was intended by them to be the substitute for CPS Clinic. The primary reasons for creating CCPSI were the continuation of CPS Clinic's business, that the new name better reflected the overarching theme and approach of the business, and its intensified focus on the CPSA. Again Dr. Greene agreed to share equally with Dr. Ablon the company's stock, and that he and Dr. Greene would be the company's only two Directors. They also agreed to split equally the profits generated by the Company. CPS Clinic, which essentially ceased operations in early 2006, was dissolved in 2007. CCPSI derived most of its income from consultation services and summer advanced training seminars.

35.     Between 2002 and 2007, CCPSI was the primary entity disseminating the CPSA. Dr. Ablon assumed responsibility for administrative oversight and certain dissemination activities; Dr. Greene continued in his role as primary author on published works and directed, supervised the evolution of the CPSA, which included the development of various assessment instruments central to the model. Assessment instruments known as the *Pathways Inventory* and the *CPS Plan* were developed by Dr. Greene during this time. He licensed his copyrights in these works and their use to CCPSI. Dr. Greene also continued in his role as the major source of income-generating projects and revenue associated with dissemination of the CPSA. A majority of the revenue generated by CCPSI resulted from Dr. Greene's work and activities. CCPSI generated profits, which were divided equally between Drs. Greene and Ablon.

-12-

### *Dr. Ablon's Scheme*

36. The publication of *Treating Explosive Kids* had the anticipated positive impact on Dr. Ablon's career. With the enhanced credibility regarding CPSA that the co-authorship designation provided, Dr. Ablon soon experienced an increased ability to disseminate the CPSA. Dr. Greene permitted him to expand his responsibilities, to engage in more workshop activities, and to solicit revenue-producing projects for CCPSI.

37. As Dr. Greene subsequently learned, Dr. Ablon's loyalty to their business relationship, his appreciation for the professional and financial mentoring which Dr. Greene had been generously providing to Dr. Ablon for years, and his willingness to honor his fiduciary obligations to CCPSI, quickly dissolved in the months following publication of *Treating Explosive Kids.* By 2006, Dr. Ablon had conceived of and had begun engaging in a calculated, methodical, and wrongful scheme to appropriate Dr. Greene's life's work, including the CPSA, his trademarks and his prior copywritten works, along with trademarks and business opportunities belonging to CCPSI, for Dr. Ablon's own, exclusive financial and professional benefit.

38. Although Dr. Ablon could have discontinued his relationship with Dr. Greene and developed his own, original and independent treatment model, he chose instead to misappropriate Dr. Greene's work and assets, and those of CCPSI, because the CPSA was an evidence based model. Treatment models of this type had to be evidence based in order to be regarded as legitimate, and in order to be marketable to their appropriate constituencies. The CPSA took ten years of evidence based foundation. Dr. Ablon would have had to spend that much time to develop an original model of his own. Rather than invest the time and effort

-13-

necessary to create a legitimate treatment model of his own after terminating his association with Dr. Greene, it was faster, and far more lucrative, to simply misappropriate CPSA as his own.

39.     In order to successfully misappropriate the property and assets of Dr. Greene and CCPSI. Dr. Ablon realized that he needed three things: his name on a recognized book pertaining to the CPSA, an organization with an existing and recognized affiliation with CPSA and a promotion to an Associate Professor position within MGH.  He already had the book credit and his association with the Institute.  He began the process of applying for the Associate Professor's position at MGH.

40.     Dr. Ablon's misappropriation scheme had the following components.  First, he surreptitiously began representing Dr. Greene's materials and copywritten content as his own or as the work of the Institute, including, *inter alia*, removing attribution language identifying Dr. Greene as the author of the materials on workshop slides and handouts to create the false impression that those materials had been originated by Dr. Ablon, and using the Greene CPSA Materials in a such a manner as to create the impression that he was the originator of those materials.  He also assumed primary oversight of the activities of the Institute, failing to keep Dr. Greene informed of important developments, and misrepresenting the origin of their professional relationship to potential donors.  Second, Dr. Ablon failed to inform Dr. Greene of potential business opportunities and secretly diverted business opportunities and assets to MGH and the Institute with whom he would remain affiliated.  Third, he began to represent through his work disseminating the CPSA that he was an author of the works which articulated the CPSA, including *The Explosive Child*, that the CPSA was now an equal creation of his and Dr. Greene's, and that he was independently qualified to develop, implement, and disseminate the model.  Fourth, he covertly and without Dr. Greene's knowledge diverted paying workshop and

-14-

seminar clients from Dr. Greene to himself. Finally, once he had sufficiently misappropriated
Dr. Greene's intellectual property, taken advantage of his infringement of Dr. Greene's
copyrights, and stolen business opportunities belonging to CCPSI and Dr. Greene, he feigned
professional disagreements with Dr. Greene and dissolved all his business affiliations with Dr.
Greene.

      41.     Dr. Ablon knew in 2006 that Dr. Greene was entirely unaware of his scheme. He
was therefore determined to preserve what was by now merely a façade of cooperation in order
to obtain the maximum time to misappropriate Dr. Greene's intellectual property, business
opportunities, and professional contacts. From this time until Dr. Greene's discovery of this
conduct in the fall of 2008, Dr. Ablon feigned a continuing commitment to his business
relationship with Dr. Greene while surreptitiously diverting corporate opportunities and revenue
belonging to Dr. Greene and CCPSI to himself and MGH. As part of his scheme, Dr. Ablon also
determined to periodically disagree with Dr. Greene on interpretative aspects of the CPSA in
order to set the stage for a planned dissolution of the relationship in late 2007 or 2008.

### *Dr. Ablon Implements His Scheme*

      42.     As early as 2002, Dr. Ablon began presenting CPSA workshops under Dr.
Greene's supervision. Dr. Greene provided his PowerPoint slides and workshop materials to Dr.
Ablon for use in these workshops. The slides bore titles attributing the materials to Dr. Greene
and Dr. Ablon as workshop "presenters". Dr. Ablon requested Dr. Greene's permission to
remove Dr. Greene's name from the titles of these slides and materials for workshops where Dr.
Ablon would be the sole presenter. Dr. Greene agreed, believing that Dr. Ablon would include
Dr. Greene's copyright designation or other attribution in another location on these slides and
materials. Dr. Ablon, as part of his artifice to defraud, surreptitiously and without Dr. Greene's

-15-

consent removed Dr. Greene's name from the slide and material titles and did not include text attributing the works to Dr. Greene at any other location on the materials. Removal of Dr. Greene's name without inclusion of alternate attribution language elsewhere was calculated to mislead workshop attendees that these works were created by Dr. Ablon and that Dr. Ablon was qualified to represent the CPSA independently. Dr. Ablon used these altered slides without Dr. Greene's knowledge or consent on multiple occasions thereafter and, upon information and belief, continues to use these slides or slides containing content substantially derived from them through the present day. Dr. Greene did not discover Dr. Ablon's use of these altered slides until August 2008.

43.    In 2006, with the permission of Drs. Ablon and Greene the Institute rebranded itself as "Think:Kids." The idea for a "Think:Kids" brand was conceived by Drs. Greene and Ablon in connection with the business purposes of CCPSI. Drs. Greene and Ablon agreed that the trademarks "Think:Kids" and "Think:Kids Rethinking Challenging Kids" should and would be registered as trademarks belonging to CCPSI. The Institute was permitted to use the marks as long as its activities were consistent with CCPSI's objectives and as long as it had CCPSI's permission to use the Marks.

44.    On February 12, 2007, CCPSI filed an application to register the service mark "Think:Kids: Rethinking Challenging Kids" with the USPTO. On May 17, 2007, CCPSI filed an application to register the service mark "Think:Kids" with the USPTO (collectively with "Think:Kids: Rethinking Challenging Kids" the "CCPSI Marks"). MGH did not object to this filing and did not seek a license from CCPSI. MGH also did not inform either Dr. Greene or Dr. Ablon that MGH considered its use of the marks in connection with the Institute, which occurred only with CCPSI's permission, as a basis for eventually claiming ownership of those marks.

-16-

45.     In November 2006, Dr. Ablon registered the domain name "thinkchildren.org" in his own name and did not disclose this to Dr. Greene, even as the two were engaged in securing trademark registration of the CCPSI Marks.

46.     In 2007, Dr. Greene became aware of an opportunity to implement the CPSA on a wide scale in the mental health systems of Oregon (the "Oregon Project"). He delegated development of this opportunity to Dr. Ablon. As with the many other business opportunities developed by Dr. Greene, this one was to be developed as a CCPSI project and all revenue and/or follow up opportunities generated by the Oregon Project were to belong to the corporation.

47.     Dr. Ablon was quick to accept the delegation of this opportunity but, unbeknownst to Dr. Greene, Dr. Ablon intended to divert this opportunity to the Institute. In furtherance of his disloyalty to CCPSI, Dr. Ablon contacted dozens of different donor and similar funding organizations to secure funding for this program as if it were to be delivered by a non-profit organization such as the Institute. Dr. Ablon was intentionally vague and unresponsive when Dr. Greene inquired about the status of the Oregon Project in the subsequent months. In the fall of 2008, Dr. Ablon informed Dr. Greene that the Oregon Project was being channeled to Think:Kids and MGH, not to CCPSI. When Dr. Greene asked why, Dr. Ablon falsely stated that the grants required that the program be run through a non-profit organization and therefore the Project had to be channeled through Think:Kids and MGH. Dr. Greene then asked Dr. Ablon to provide him with the relevant grant requirements for verification. In response, Dr. Ablon changed his story, admitting instead that the grant requirement did not require the use of a non-profit organization and that he "felt" it would be "better" if the program were directed to MGH. Dr. Greene informed Dr. Ablon that Ablon had wrongfully and without

authorization diverted the Oregon Project away from CCPSI. Dr. Ablon refused to correct the situation and continues to benefit from the misappropriation of this opportunity to Think:Kids and MGH.

48.    Upon information and belief, Dr. Ablon began conspiring in 2008 with MGH to take control of the Institute and to direct all intellectual property and business opportunities he could misappropriate to MGH and Think:Kids. The seizure of control of Think:Kids by Dr. Ablon was timed to coincide with Ablon's dissolution of his business relationships with Dr. Greene. It was accomplished by presenting Dr. Greene with a set of conditions for his continued involvement with Think:Kids which he would certainly reject.

49.    In early 2005, Dr. Greene conceived of a new book, ultimately called *Lost At School*, in which he sought to focus the CPSA in the school environment. Dr. Greene informed Dr. Ablon about the new book and that Dr. Ablon would not be permitted to participate in writing the new work. On or about September 10, 2007, Drs. Greene and Dr. Ablon agreed in writing that Dr. Ablon would not be listed as an author of or contributor to *Lost At School*.

50.    On or about September 14, 2007, Dr. Greene signed a publishing contract with Simon & Schuster for the publication and distribution of *"Lost At School." Lost At School*, a guide for families and educators through the use of the CPSA in and for school settings, was written exclusively by Dr. Greene, was substantially derived from *The Explosive Child* and included then-current revisions to *The Explosive Child* and the CPSA. This work was first published on October 21, 2008. On October 31, 2008, the copyright for *Lost At School* was registered with the U.S. Copyright Office under Dr. Greene's name.

51.    In connection with the publication of *Lost At School*, Dr. Greene registered the domain name "lostatschool.org" on February 14, 2008. As he did with *The Explosive Child*, Dr.

-18-

Greene developed a website for *Lost At School* as a source of information and direction about the new book. The *Lost At School* website, lostatschool.org was launched shortly thereafter.

52.     In the fall of 2007, Dr. Ablon began to promote Think:Kids by making representations to clients and professional colleagues regarding the program's accomplishments. Those representations were false because the accomplishments Dr. Ablon was representing as belonging to Think:Kids in fact were the accomplishments of CCPSI. Dr. Greene objected to Dr. Ablon about the latter's representations regarding Think:Kids. Dr. Ablon continued to make these false representations and to indicate that he considered this disagreement to constitute "professional differences". Dr. Greene responded to these statements by informing Dr. Ablon that he believed the representations in the context in which Dr. Ablon was making them to be unethical and that he would not endorse any such statements.

53.     In August 2008, MGH suddenly informed Drs. Greene and Dr. Ablon that, in order to continue their involvement in Think:Kids, they would have to dissolve CCPSI and bring all of its operations into MGH. MGH's Chief of Psychiatry, Jerrold Rosenbaum, informed Dr. Greene for the first time that Dr. Greene would have to surrender all his intellectual property rights in CPSA and its related models and intellectual oversight over the CPSA as well. MGH had never indicated prior to this time, and no document or other agreement was ever presented substantiating that Dr. Greene's association with the Institute would require him to surrender the intellectual property and intellectual oversight of his life's work to MGH. Dr. Greene rejected this proposal. Dr. Greene eventually learned that Dr. Ablon had accepted MGH's proposal and that he had been appointed Director of Think:Kids.

54.     Dr. Ablon's surreptitious attempts to divert business opportunities and corporate assets away from Dr. Greene and CCPSI and exclusively to himself intensified in 2008. Dr.

Greene and Dr. Ablon had created a website called CCPSInfo.org to organize interest in CPSA

workshops. In addition to scheduling workshops, potential clients could, by clicking a button,

select whether they wanted Dr. Ablon or Dr. Greene to run the workshop. Clients with no

preference could click "either". Dr. Greene and Dr. Ablon had an agreement regarding the

manner in which clients sending email expressing interest in CPSA workshops would be

handled. Since the vast majority of the workshop requests were for Dr. Greene, email

notifications from clients seeking workshops were sent from the web site to

CPStraining@gmail.com, an email address which Dr. Greene oversaw. Dr. Greene and Dr.

Ablon had an agreement that Dr. Greene would forward all requests seeking Dr. Ablon's

workshop participation to him. Dr. Greene would of course keep those requests that sought him,

and requests listing "either" could, in Dr. Greene's sole discretion, be retained either by him or

forwarded to Dr. Ablon. At this time, Dr. Ablon was fielding requests from parents for

psychotherapy services through this website and those requests were sent from the website to

CPSclinic@gmail.com, an email address under Dr. Ablon's control.

     55.     In July, 2008, Dr. Ablon contacted the webmaster for this website and instructed

him to change the email notification protocols so that all requests listing "either" for the

presenter were also sent to CPSclinic@gmail.com, and further directing the webmaster that

because he, Dr. Ablon, was an officer of CCPSI, no changes to the website were to be made in

the future without his knowledge and consent. Dr. Ablon did not inform Dr. Greene of this

change to the website email notification protocols. Dr. Ablon thereafter began responding to the

workshop requests listing "either" directly, on his own behalf, and unbeknownst to Dr. Greene.

     56.     In the fall of 2008, Dr. Ablon provided consulting services on behalf of the Center

to an organization in Ottawa, Canada, for which he received approximately $14,000.00. He did