UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROSS GREENE,<br><br>      Plaintiff,<br><br>      v.<br><br>J. STUART ABLON and THE GENERAL<br>HOSPITAL CORPORATION D/B/A<br>MASSACHUSETTS GENERAL HOSPITAL,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 09-cv-10937-DJC |

## STATEMENT OF UNDISPUTED FACTS

### Parties

1.      The General Hospital Corporation d/b/a Massachusetts General Hospital (sometimes referred to herein as "MGH" or the "Hospital") is a Massachusetts non-profit corporation with a principal place of business at 55 Fruit Street, Boston, MA.  MGH Counterclaim (Doc. 19), p. 23, ¶ 1; Plaintiff's Answer to MGH Counterclaim (Doc. 21), p. 1, ¶ 1.

2.      Ross Greene ("Greene") is an individual residing at 45 Mount Alvernia Road, Newton, MA.  MGH Counterclaim (Doc. 19), p. 23, ¶ 2; Plaintiff's Answer to MGH Counterclaim (Doc. 21), p. 1, ¶ 2.

3.      Stuart Ablon ("Ablon") is an individual residing in Wellesley, MA.  Amended Verified Complaint (Doc. 7), ¶ 3; Ablon's Answer to Amended Complaint (Doc. 17) (response to ¶3).

**Greene's Affiliation with MGH**

4.      From July 1, 1993 through November 5, 2009, Greene held a series of appointed positions in the MGH Department of Psychiatry as a Member of the Hospital's Professional Staff. Affidavit of Linda Weinstein filed February 8, 2012 ("Weinstein Aff."), ¶¶ 3-36.

5.      Prior to his appointment to each position, Greene submitted an application in which he agreed to abide by the bylaws, rules, regulations and policies of the Professional Staff and of the Hospital. *Id.,* ¶¶ 5, 8, 11, 14, 17, 22, 25, 28, 31, 34, and Exhibit A thereto (MGH283-285, 300-301, 320-321, 328-329, 334-340, 366-367, 1001-1003, 1019-1021, 1039-1042, 1062-1065). In applications submitted by Greene, he acknowledged that he had received and had an opportunity to read (or promised to read) the bylaws of the Professional Staff. *Id.,* ¶¶ 14, 17, 22, 25, 28, 31, 34 and Exhibit A thereto (MGH 284, 301, 321, 1002, 1020, 1042, 1065).

6.      The bylaws of the MGH Professional Staff in effect from February 21, 1992 through May 20, 2010 contained the following language:

> In discharging the duties and exercising the privileges of his or her appointment, each Staff Member shall be subject to these Bylaws and to all applicable rules and regulations and policies of the Hospital. . . .

Affidavit of Christopher Clark, Esq. filed February 8, 2012 ("Clark Aff."), ¶ 4.

7.      The terms and conditions of each appointment were contained in a Professional Staff Appointment Form which conditioned Greene's appointment on his agreement to "[a]bide by the Bylaws, rules, regulations, and policies of the Professional Staff and the Hospital". Weinstein Aff., ¶¶ 10, 13, 16, 18, 21, 24, 27, 30, 33, 36 and Exhibit A thereto (MGH 279, 298, 315, 318, 325, 333, 361, 1008, 1030, 1051, 1074).

8.      From 1994 through 2004, Greene served as "Director of Cognitive-Behavioral Psychology, Clinical and Research Program in Pediatric Pharmacology, Massachusetts General

Hospital, where he specialize[d] in the treatment of inflexible, easily frustrated, explosive

children and adolescents, and their families."  Affidavit of Denis M. King, Esq. filed

February 8, 2012 ("King Aff."), ¶ 12.a.

**The MGH Intellectual Property Policy**

*The 1995 Policy*

9.     On or about April 21, 1995, the MGH Board of Trustees adopted an MGH

Intellectual Property Policy (the "1995 IP Policy").  Clark Aff., ¶ 5.

10.     Section 1.1 of the 1995 IP Policy states, in relevant part:

> This Policy governs the handling of Inventions, Copyrightable Works, and
> other Intellectual Property, including certain tangible research property,
> made by individuals involved in educational, research, clinical or other
> activities of The Massachusetts General Hospital ("the MGH") and its
> affiliated institutions (the MGH and its affiliates are collectively referred
> to in this Policy as "the MGH Affiliated Institutions" or "Institutions").

*Id.,* ¶ 6.

11.     The 1995 IP Policy defines the term "Member" as follows:

> A **"Member of the MGH Community"** or **"Member"** means each
> member of the Professional Staff of an Institution, including individuals
> holding appointments as Visiting Staff, each student, and each employee
> of an Institution.

*Id.,* ¶ 7.

12.     The 1995 IP Policy defines the term "Trademark" as follows:

> **"Trademark"** means any word, phrase, logo, design or other symbol used
> to identify and distinguish the source of goods or services.  As used here,
> the term includes any trademark, service mark, trade name or trade dress.

*Id.,* ¶ 8.

13.     Section 14.0 of the 1995 IP Policy states in relevant part:

> Trademarks shall be owned by MGH if they are created by Members in
> the course of their employment or affiliation with an Institution or if they
> are used to identify any product or service originating with or associated
> with an Institution.

*Id.,* ¶ 9.

14.     Section 16.0 of the 1995 IP Policy (Other Intellectual Property) states:

> Any Intellectual Property not specifically covered by the foregoing
> sections of this Policy shall be owned by an Institution if it is created in
> the performance of Sponsored or Supported Activity at that Institution (see
> Glossary).

*Id.,* ¶ 10.

15.     The 1995 IP Policy defines the terms "Sponsored Activity and "Supported

Activity" as follows:

> **"Sponsored Activity"** means any activity that either receives direct or
> indirect financial support from an Institution, including funding from any
> outside source awarded to or administered by the Institution, or makes
> substantial use of space, facilities, materials or other resources of the
> Institution including resources provided in-kind by outside sources.  For
> purposes of this definition, the use of office space and word processors
> alone shall not be considered a "substantial use" of resources.

> **"Supported Activity"** means any activity that is subject to a grant,
> contract or other arrangement between an Institution and a third party,
> such as the federal government, a foundation or corporate research
> sponsor.

*Id.,* ¶ 11.

*The 2002 Policy*

16.     On July 19, 2002, the MGH Board of Trustees adopted a revised Intellectual

Property Policy (the "2002 IP Policy").  *Id.,* ¶ 12.

17.    Section 1.1 of the 2002 IP Policy states in relevant part:

> This Policy governs the handling of . . . Intellectual Property made by
> individuals involved in educational, research, clinical and other activities
> of Hospitals and other Institutions that are affiliated with the Partners
> HealthCare System . . . and that have adopted this Policy.  As of the date
> of this printing of this Policy, those Institutions include Brigham and
> Women's Hospital ("BWH"), The Massachusetts General Hospital
> ("MGH") [footnote omitted ], McLean Hospital ("McLean"), Spaulding
> Rehabilitation Hospital ("Spaulding"), the MGH Institute of Health
> Professions ("the MGH Institute"), and certain physicians organizations
> affiliated with them. . . .  Throughout this Policy, BWH, MGH, Spaulding
> and McLean are referred to collectively as "the Hospitals" and
> individually as a "Hospital.  The Hospitals and their affiliated
> institutions . . . are collectively referred to as "the Affiliated Institutions"
> or "Institutions."

*Id.,* ¶ 13.  That same section provides elsewhere that:  "The individuals covered by this Policy

are referred to as 'Members.'"  *Id.*

18.    The 2002 IP Policy defines the term "Member" as follows:

> A **"Member of the Institutional Community"** or **"Member"** means
> each member of the Medical/Professional Staff (including individuals
> holding appointments as Visiting Staff) of MGH, BWH, Spaulding, or a
> Hospital affiliated with any of them; and to each faculty member, student,
> and employee of the Hospital or another Institution.

*Id.,* ¶ 14.

19.    The 2002 IP Policy defines the term "Trademark" as follows:

> **"Trademark"** means any word, phrase, logo, design or other symbol used
> to identify and distinguish the source of goods or services.  As used here,
> the term includes any trademark, service mark, trade name or trade dress.

*Id.,* ¶ 15.

20.    Section 14.0 of the 2002 IP Policy states in relevant part:

> Trademarks shall be owned by an Institution if they are created by
> Members in the course of their employment or affiliation with an
> Institution, if they are used to identify any product or service originating
> with or associated with an Institution, or pertain to significant Institutional
> Activities.

*Id.,* ¶ 16.

21.     MGH is an "Institution" and Greene is a "Member" within the meaning of the 2002 IP Policy.

22.     The 2002 IP Policy defines the term "Institutional Activities" as follows:

> **"Institutional Activities"** means any activities that received direct or indirect financial support from an Institution, including Institutional salary support or funding from any outside source awarded to or administered by the Institution, made substantial use of any space, facilities, materials or other resources of the Institution, including resources provided in-kind by any outside sources (the use of office space and word processors alone is not considered a "substantial use" of resources; or were otherwise subject to any grant, contract or other arrangement between the Institution and a third party, such as the federal government, a foundation or corporate research sponsor.

*Id.,* ¶ 17.

23.     Essentially, the term "Institutional Activities" is a slightly revised combination of the definitions of "Sponsored Activities" and "Supported Activities" found in the 1995 IP Policy. *Id.* The 2002 IP Policy eliminated Section 16.0 of the 1995 IP Policy and, among other things, added the final clause to Section 14.0 ("or pertain to significant Institutional Activities"), which incorporated the concepts of "Supported Activities" and "Supported Activities" from the 1995 IP Policy. *Id.*

**The "Collaborative Problem Solving Approach" and the CPS Institute at MGH**

24.     The first edition of Greene's book, *The Explosive Child*, was published on September 4, 1998.  The book advocated a method of dealing with behaviorally challenged children and adolescents.  The phrase "collaborative problem solving" does not appear at all in the first edition of the book.  King Aff., ¶¶ 43-44.  It is not until the second edition of the book, first published on December 27, 2000, that the words first appear in the text, and even then, the words are used largely in a descriptive fashion. *Id.*, ¶¶ 43, 45.

GSDOCS\2038830.6

25.     From 1999-2001, Greene was the Principal Investigator on a study conducted at MGH and funded by the Stanley Research Foundation entitled "Investigation of the Effectiveness of a Family-Based, Individualized Approach to Cognitive-Behavioral Therapy for Oppositional, Aggressive Behavior in Children with Mania", which examined the effectiveness of the collaborative problem solving approach in outpatient populations. *Id.*, ¶12.b.

26.     From 2001-2004, Greene was the Principal Investigator on a study conducted at MGH and funded by the Stanley Research Foundation entitled "Combined and Relative Effects of Pharmacotherapy and Cognitive-Behavioral Therapy in the Treatment of Childhood Bipolar Disorder", which examined the relative and combined effects of the collaborative problem solving approach and pharmacotherapy. *Id.,* ¶ 12.c.

27.     In 2002, Greene and J. Stuart Ablon ("Ablon") approached Dr. Jerrold Rosenbaum, Chair of MGH's Department of Psychiatry, with a proposal that MGH create a program within the Department of Psychiatry to be called the "CPS Institute" and/or the "Collaborative Problem Solving Institute" (the "CPS Institute"). [1]  Affidavit of Jerrold Rosenbaum, M.D. filed February 8, 2012 ("Rosenbaum Aff."), ¶ 2; Clark Aff., ¶ 19. The proposal was ultimately approved, and the CPS Institute was created as a program within the MGH Department of Psychiatry.  Rosenbaum Aff., ¶ 2.  The CPS Institute was not a separate legal entity.  It relied on MGH's non-profit status in order to solicit tax deductible contributions. Rosenbaum Aff., ¶ 2; King Aff., ¶ 47.

28.     On or about September 25, 2002, Greene sent an email to Christopher Clark, Esq., an attorney within the MGH Office of General Counsel ("MGH Attorney Clark" or "Clark"), attached to which was a document that Greene described as "the description of the CPS Institute"

---

[1] The parties used the terms CPS Institute and Collaborative Problem Solving Institute interchangeably, and the terms are used interchangeably in this document as well.

("Greene's CPS Institute Description"). Clark Aff., ¶ 20. The first page of Greene's CPS Institute Description described the CPS Institute as "a non-profit organization affiliated with the Department of Psychiatry at Massachusetts General Hospital. . . ." *Id.*[2]

29.     Greene's CPS Institute Description stated that the CPS Institute would have three overarching missions:

- To disseminate information about the factors underlying explosive/noncompliant behavior in children to parents, educators, mental health clinicians, and medical professionals, so as to promote a greater understanding and enhanced treatment of such behavior

- To fund high quality clinical services for disadvantaged explosive/noncompliant youths

- To fund research focusing on the causes, sequelae, and effective treatment of explosive/noncompliant behavior

*Id.,* ¶ 21.

30.     Green's CPS Institute Description also stated that one of the primary missions of the CPS Institute would be to "educate children, parents, educators, mental health clinicians, and medical professionals about explosive/noncompliant behavior, so as to promote a greater understanding of children who exhibit this behavior." *Id.,* ¶ 22.

31.     In a section entitled "Funding," Greene's CPS Institute Description stated:

Funding for the above activities will be sought from the federal government (in the form of research grants), foundations and private donors. All funds will be deposited into an account at MGH, using the hospital's nonprofit status. Funds will then be disbursed to the various projects described above.

*Id.,* ¶ 24.

32.     On or about September 30, 2002, MGH Attorney Clark sent an email to Greene attached to which was a document containing Clark's comments on Greene's CPS Institute

---

[2] Greene's understanding of the status of the CPS Institute was later corrected by counsel in the MGH Office of General Counsel. *See* paragraphs 32, 34, *infra.*

Description. *Id.,* ¶ 25. One comment made by Clark was that Greene seemed to describe "the CPS Institute being a separate entity or organization of some sort, rather than a Center that will be completely within and part of the MGH Department of Psychiatry". *Id.* Clark described this as "a rather fundamental opening issue. . . ." *Id.* One of Clark's proposed changes was to describe the CPS Institute as "a Center within the Department of Psychiatry at Massachusetts General Hospital." *Id.*

33.     Clark also revised the paragraph entitled "Funding," making it clear that: "All funds will be sought through and handled by the appropriate offices of the MGH such as the Research Grants Administration Office and the Development Office in accordance with the normal policies and procedures of those offices and of MGH." *Id.,* ¶ 26.

34.     On or about October 2, 2002, Greene sent an email to Clark in which Greene stated, among other things, that Clark's "wording changes clarifying that the CPS Institute is completely within and part of the MGH Department of Psychiatry look fine to me." *Id.,* ¶ 27. Despite this statement, Greene subsequently referred to the CPS Institute in a manner that suggested status as a separate "nonprofit" on many occasions. *See, e.g., id.,* ¶¶ 7 ("Our non-profit, the Collaborative Problem Solving Institute, is on the precipice of launching a major public awareness campaign"), 28 ("And now there's a non-profit organization – the Collaborative Problem Solving Institute – that has been established"), 46.b ("Think:Kids is an initiative of the nonprofit Collaborative Problem Solving Institute"); Exhibit 10PW (Doc. 62-2) to Plaintiff's Dissection Brief, p. RG 2640 ("Dr. Greene donates a portion of the honoraria he receives to the non-profit **Collaborative Problem Solving Institute**, based in the Department of Psychiatry at Massachusetts General Hospital.") (emphasis in original).

35.     On or about December 12, 2002, Greene sent MGH Attorney Clark an email asking who he should speak to concerning his desire to (i) create a brochure for the CPS Institute, (ii) create a CPS Institute newsletter, and (iii) form an advisory board "comprised of potential big contributors, folks who might help us identify potential contributors, and luminaries." *Id.*, ¶ 28.

36.     The MGH Department of Psychiatry advanced the sum of $55,641 to Greene to assist in the build out and furnishing of the CPS Institute offices. Rosenbaum Aff., ¶ 10. As of July 26, 2005, only $15,000 had been paid back. *Id.* The full amount was subsequently repaid. *Id.*

37.     In January 2003, an MGH "sundry fund" was created for the CPS Institute into which all program grants and donations were deposited. *Id.,* ¶ 9.

38.     The MGH Development Office assisted the CPS Institute in its development efforts. This included (i) assistance in the preparation of brochures to be used for fundraising purposes, (ii) organizing and scheduling strategic planning meetings, (iii) organizing and scheduling fundraising receptions, and (iv) receipt and processing of nearly $1.6 million in charitable donations to the CPS Institute. Affidavit of Carol W. Taylor filed February 8, 2012 ("Taylor Aff."), ¶¶ 2-11.

39.     With the assistance of the MGH Development Office, the CPS Institute produced a brochure with the words "Collaborative Problem Solving Institute" on the cover directed at and distributed to potential donors. The cover also bore the MGH name and logo. It discussed the Collaborative Problem Solving Approach and cited studies conducted at MGH in support of the efficacy of the approach. The brochure also contained the following language:

> By making a philanthropic contribution to the CPS Institute, you support the education, training, clinical and research efforts to help challenging children and adolescents.
>
> We welcome and appreciate gifts of any size. Please contact the Massachusetts General Hospital Development Office for more information, or mail your check, made payable to the Massachusetts General Hospital, to the following address:
>
> Massachusetts General Hospital
> Development Office
> 100 Charles River Plaza, Suite 600
> Boston, MA 02114-2792

*Id.,* ¶ 8.

40.     Donations received by MGH for the CPS Institute were placed in the sundry fund established for the CPS Institute and administered by MGH. During the existence of that fund, the CPS Institute received, through MGH, $961,184.37 in gifts and $722,000 in pledges, of which all but $90,000 of the pledges was actually paid. Thus, the CPS Institute received a total of $1,593,184.37 in total gifts and pledges actually paid. *Id.,* ¶ 11.

41.     Greene was the Director of the CPS Institute. While serving as Director of the CPS Institute at MGH, Greene used (a) a form of email referring to himself as Director of the CPS Institute, King Aff., ¶ 4, (b) fax cover sheets containing the MGH name and logo, and referencing the CPS Institute, *id.,* ¶ 13, and (c) stationery containing the MGH name and logo, and referencing himself as Director of the CPS Institute. *Id.,* ¶ 26.

42.     While serving as Director of the CPS Institute at MGH, Greene identified himself in numerous flyers, books, papers and articles as Director of the CPS Institute in the Department of Psychiatry at MGH. *Id.,* ¶¶ 8-11, 14-25, 27. This included a book published in 2006 that he co-authored with Ablon entitled *Treating Explosive Kids: The Collaborative Problem Solving Approach. Id.,* ¶ 27.

GSDOCS\2038830.6

43.     While Greene was serving as Director of the CPS Institute at MGH, the CPS

Institute had a website (www.cpsinstitute.org) that contained the MGH name and logo on every

page.  *Id.,* ¶ 42.  The Home page described the CPS Institute as follows:

> Based in the Department of Psychiatry at Massachusetts General Hospital,
> the CPS Institute was founded in 2002 to assist parents, educators and
> mental health and medical professionals in understanding and
> implementing the Collaborative Problem Solving approach.

*Id.*.  On the page entitled "The Approach," the website noted that "Staff from the CPS Institute

train more than 20,000 parents, educators, and mental health and [*sic*] professionals in the

Collaborative Problem Solving approach a year."  *Id.*.  On the page entitled "How You Can

Help," potential donors were asked to contact the MGH Development Office, and the Office's

contact information was provided.  *Id.*  In connection with the training programs sponsored by

the CPS Institute, Greene prepared and used slides identifying the presenters as affiliated with

the CPS Institute at MGH, and setting forth the mission of the CPS Institute.  Affidavit of J.

Stuart Ablon in Opposition to the Dissection Brief of the Plaintiff, Ross Greene (Doc. 78), ¶¶ 25,

28 and Exhibit H (Doc. 78-10, SA 1612) and Exhibit J (Doc. 78-12, RG8523) thereto; Affidavit

of Ross Greene, Ph.D. in Support of Reply (Doc. 85), ¶ 13.

44.     On January 3, 2007 Greene sent an email to an attorney at Milbank, Tweed,

Hadley & McCloy.  In the email, Greene stated:

> Stuart [Ablon] and I are pulling together materials for you to
> support the trademarking of "Collaborative Problem Solving" and
> "Children do well if they can," and anticipate sending everything
> along by the end of the week.  In the meantime, another
> trademarking need has arisen.  Our non-profit, the Collaborative
> Problem Solving Institute, is on the precipice of launching a major
> public awareness campaign under the brand "Think:Kids", with the
> tagline of "Rethinking challenging kids."  Obviously before we
> launch our campaign, we want to make sure we're in the clear with
> the brand and tagline."

*Id.,* ¶ 7. Ablon has noted that the "Think:Kids" brand was created with the assistance of marketing and other professionals paid for by the Hospital.  Affidavit of J. Stuart Ablon in Opposition to the Dissection Brief of the Defendant, Ross Greene (Doc. 78), ¶ 6; *see* ¶ 53, *infra* (grant application submitted by Greene noting that Think:Kids public awareness campaign "has been developed with assistance from consultants with expertise in marketing, advertising, and public relations.").

45.     In 2007, a website established by the CPS Institute (www.thinkkids.org) (a) had a Home page containing the MGH name and logo, (b) had a page entitled "Affiliation" that stated "Think:Kids is an initiative of the nonprofit Collaborative Problem Solving Institute in the Department of Psychiatry at Massachusetts General Hospital, Boston, Massachusetts" and contained the names and logos of both MGH and the MGH Department of Psychiatry, (c) had a page entitled "About Think:Kids" that stated "Think:Kids staff currently train 75,000 parents, educators, and mental health professionals throughout the world each year in applying the CPS model, via books, seminars, videoconferencing, online programming, and summer advanced trainings" and (d) contained the words "Think:Kids: Rethinking Challenging Kids" on every page. *Id.,* ¶ 46.

46.     While Greene was serving as Director of the CPS Institute at MGH, the CPS Institute published a newsletter in the winter of 2007 under the name "Think:Kids."  The first page of the newsletter, signed by Greene, contained the MGH name and logo, and stated that "Think:Kids is an initiative of the CPS Institute, Department of Psychiatry." *Id.,* ¶ 6.  The second page contains, among other things, the following information:

- Our work in the juvenile detention system in the state of Maine has led to an extraordinary opportunity to implement the CPS model in an entire town. Sanford, Maine, has been selected by Maine's Juvenile Justice Advisory Group to implement CPS in all segments of the community affecting outcomes for

13

challenging kids, including all seven Sanford schools, the police department, the juvenile justice system, mental health professionals, and parents. The Muskie Institute at the University of Southern Maine will oversee data collection and analysis for this three-year project.

- In Massachusetts, we have been directly involved in training various facilities for very challenging and often disadvantaged, traumatized kids and have begun establishing strategic partnerships with certain facilities so as to create model programs for other similar facilities to emulate. Several group homes and residential facilities serving some of Boston's neediest kids under the umbrella of the Massachusetts Department of Social Services (DSS) are in the midst of implementing the CPS model, including A New Leaf (a program of Children's Services of Roxbury), Roxbury House (a program of the Home for Little Wanderers), and the Italian Home. Our strategic partnership with the Child Assessment Unit at Cambridge City Hospital is helping that facility train other inpatient units in the implementation of CPS.

- Our DVD for parents is in the final stages of editing! That means that hundreds of thousands of parents throughout North America will soon be receiving training kits to help them better understand and respond to the needs of their challenging kids. Next on the agenda: a training kit for educators.

*Id.* The final page of the newsletter invited the readers to:

Check out our new website!

We are thrilled to announce the launch of the new Think:Kids website complete with streaming video, blogging, and on-line training materials. Visitors can learn about our revolutionary way of understanding and helping challenging kids through personalized portals for parents, educators, systems and facilities, and pediatricians. We have begun taking orders on the site for the new Think:Kids Parent Training Kit which will be available by the end of the year. Several hundred parents and organizations have already signed up. The first Think:Kids podcast will soon appear as well.

Come see for yourself at **www.thinkkids.org.**

*Id.* (emphasis in original.) That same page invites readers to:

Learn more about the Collaborative Problem Solving approach in the fall addition of Proto magazine (www.protomag.com), a publication from Massachusetts General Hospital featuring cutting edge developments in healthcare.

*Id.*

47.     In September 2005, while serving as Director of the CPS Institute at MGH, Greene submitted a grant application to the TD Banknorth Charitable Foundation. Affidavit of Kim Molino filed February 8, 2012 ("Molino Aff."), ¶3 and Exhibit A thereto. The application sought funding for "[e]xpansion of existing successful, replicable program, applying the collaborative problem solving approach in juvenile detention facilities in Maine". Exhibit A to Molino Aff., p. 1. The request was submitted on behalf of "The Collaborative Problem Solving (CPS) Institute in the Department of Psychiatry at Massachusetts General Hospital." *Id.,* p. 3 (p. 1 of September 30, 2005 letter). The CPS Institute was described as follows:

> *The CPS Institute:* Established at Massachusetts General Hospital in 2002, the mission of the CPS Institute is to become the leading advocate for enlightened understanding and treatment of children and adolescents with social, emotional, and behavioral challenges through training, research, education, and practice of the Collaborative Problem Solving approach; to reduce short- and long-term public health costs to society for treatment, hospitalization, incarceration, and recidivism of these youth; and to help generations of people who will apply a collaborative problem solving approach to problems and interactions.

*Id.,* p. 4 (p. 2 of September 30, 2005 letter).

48.     In November 2005, while serving as Director of the CPS Institute at MGH, Greene submitted a grant application to the Margaret E. Burnham Charitable Trust. Molino Aff., ¶ 4 and Exhibit B thereto. The grant application noted a collaboration between the CPS Institute and Maine's Department of Juvenile Services that began nearly two years before. Exhibit B to Molino Aff., p. 1 (p. 1 of November 14, 2005 letter). The final page, on MGH stationery signed by Greene on November 14, 2005, states that "[t]he requesting organization is recognized by the IRS as a tax-exempt, nonprofit organization and is not a private foundation." *Id.* (final page).

49.     In November 2005, while serving as Director of the CPS Institute at MGH, Greene submitted a grant application to the TD Banknorth Charitable Foundation. Molino Aff.,

¶5 and Exhibit C thereto.  Under the heading "The Collaborative Problem Solving Model," the application stated, among other things:

> The CPS model has been successful in many settings, including families, inpatient hospital units, residential treatment facilities, juvenile detention facilities, group homes, therapeutic day schools, special education schools, general education schools and day care settings.  CPS Institute staff train more than 20,000 parents, educators, and mental health professionals throughout the world in the CPS model each year.

Exhibit C to Molino Aff., p. 5.  Identical language is contained in a letter (on MGH/Collaborative Problem Solving Institute stationery) dated December 14, 2005 from Greene to the Executive Director of the Florence V. Burden Foundation.  Molino Aff., ¶6 and Exhibit D thereto.

50.     On March 30, 2006, while serving as Director of the CPS Institute at MGH, Greene sent a letter (on MGH/Collaborative Problem Solving Institute stationery) to the Managing Trustee of the C.F. Adams Charitable Trust thanking her for the opportunity to meet to "describe the activities and progress of the Institute during the first year of the C.F. Adams Charitable Trust's multi-year commitment of $150,000."  Molino Aff., ¶7 and Exhibit E thereto (p. 1).  Under the heading "Program Developments," after describing the work of the CPS Institute in the juvenile detention system in Maine, Greene stated:

> Additionally, the Institute's work in inpatient psychiatry units for children and adolescents has expanded to units at the Yale Child Study Center in New Haven, Connecticut; at Acadia Hospital in  Bangor, Maine; and at units in Fort Worth, Texas; Helena, Montana; Kelowna, British Columbia; and Portland, Oregon.  This work will soon be extended further to inpatient facilities in Providence, Rhode Island; Brattleboro, Vermont; Springfield, Massachusetts; and Concord, New Hampshire.

Exhibit E to Molino Aff., p. 3.

51.     On April 12, 2006, while Greene was serving as Director of the CPS Institute at

MGH, Greene and Ablon sent a letter to representatives of the George H. & Jane A. Mifflin

Memorial Fund.  Molino Aff., ¶8 and Exhibit F thereto.  The letter began:

> At the suggestion of Mr. Edward P. Lawrence, Esquire, Chair of the
> Massachusetts General Hospital Board of Trustees, we are honored to
> submit the attached proposal to the George H. & Jane A. Mifflin Memorial
> Fund in support of a unique collaboration between the Massachusetts
> General Hospital Department of Psychiatry's Collaborative Problem
> Solving Institute and the James P. Timilty Middle School, a Boston public
> school in the Roxbury neighborhood.

Exhibit F to Molino Aff., p. 1.  Under the heading "Agency Information", the attached proposal

again noted that CPS staff train "more than 20,000 parents, educators, and mental health

professionals each year in applying the CPS model, via one-day seminars, video conferencing,

online programming, and summer advanced trainings for mental health clinicians and

educators." *Id.*, p. 4.  The proposal continues:

> The CPS Institute provides one example of the reason the MGH
> Department of Psychiatry has consistently been ranked as the leading
> psychiatry service in the country in the annual *U.S. News & World Report*
> survey, "America's Best Hospitals."

*Id.*  On the following page, under the heading "Organizational Structure," the proposal states:

> The CPS Institute is a program within the Massachusetts General Hospital
> Department of Psychiatry, led by Jerrold F. Rosenbaum, MD, Chief.  The
> MGH Board of Trustees (please see attached list) oversees the Institute.
> Edward P. Lawrence, Esquire, Chair of the MGH Board of Trustees, also
> serves on the CPS Institute Advisory Council, a volunteer group that
> provides strategic planning and development guidance to the Institute.

*Id.*, p. 5.

52.     In April 2006, while serving as Director of the CPS Institute at MGH, Greene

submitted a grant application (under cover of a letter dated April 25, 2006 on

MGH/Collaborative Problem Solving Institute stationery) to Bank of America Philanthropic

Management.  Molino Aff., ¶9 and Exhibit G thereto.  The application contains language

identical to that contained in the proposal discussed in the preceding paragraph concerning CPS

staff training over 20,000 people annually in the Collaborative Problem Solving Approach,

Exhibit G to Molino Aff. (p. 4 of letter), and the CPS Institute being an example of why the

MGH Department of Psychiatry has consistently been ranked as the leading psychiatry service in

the country in the annual *U.S. News & World Report* survey. *Id.* It also contains identical

language concerning the oversight of the CPS Institute by the MGH Board of Trustees. *Id.* (p. 8

of letter). It also notes: "The Collaborative Problem Solving Institute operates under the

501(c)(3) tax exempt status of Massachusetts General Hospital . . . ." *Id.*

53.     In March 2007, while serving as Director of the CPS Institute at MGH, Greene

submitted a grant application to Hedge Funds Care. Molino Aff., ¶10 and Exhibit H thereto.

Among other things, under the heading "Current Programs/Services and Achievements," that

application stated:

> [O]ur Public Awareness Campaign, *Think:Kids — Rethinking Challenging
> Kids,* is disseminating on a large scale a more contemporary, more
> accurate understanding of the true difficulties of kids with social,
> emotional, and behavioral challenges. This is accomplished through a
> new, interactive website with streaming video and blogging; and
> production and low-cost distribution of films and collateral materials
> tailored to specific target constituencies (parents, educators, pediatricians
> and family physicians, and mental health clinicians and staff). The Public
> Awareness Campaign has been developed with assistance from
> consultants with expertise in marketing, advertising, and public relations.
> Distribution of information is occurring not only through the vehicles
> described above but also through existing channels such as family support
> networks and centers.

Exhibit H to Molino Aff., pp. 5-6. The application also attached, among other things, a

list of the names of the members of the MGH Board of Trustees and MGH's audited

financial statements. Exhibit H to Molino Aff. (attachments).

54.     On February 4, 2008, while serving as Director of the CPS Institute at MGH,

Greene sent a letter dated to the Executive Director of the Sam L. Cohen Foundation enclosing a

grant application.   The cover letter is on stationery bearing the MGH name and logo as well as

the name "Collaborative Problem Solving Institute."  Greene is listed on the letterhead as

"Director."  The cover letter begins with the statement:  "On behalf of Massachusetts General

Hospital's Collaborative Problem Solving Institute, thank you and the Trustees of the Sam L.

Cohen Foundation for allowing us to submit a formal application in support of expanding the

Institute's work in Maine."  King Aff., ¶ 29.  Among other things, the grant application

contained the following information:

- On page 1, it stated:  "The CPS Institute is a program within the Massachusetts General Hospital Department of Psychiatry, lead by Jerrold F. Rosenbaum, MD, Chief.  Peter Slavin, MD, serves as President of Massachusetts General Hospital, and the MGH Board of Trustees oversees the institution."  *Id.,* ¶ 30.

- On page 5, it stated:  "The Institute works closely with the MGH Development Office to steward existing donors as well as to identify and solicit new donors." *Id.,* ¶ 31.

- On page 6, it noted that among the attachments to the grant application are (1) the most recent audited financial statement of MGH, (2) an MGH organization operating budget with revenue and expenses and (3) a letter from the U.S. Internal Revenue Service acknowledging MGH's non-profit status under Code section 501(c)(3).  *Id.,* ¶ 32.

55.     On numerous occasions, while serving as Director of the CPS Institute at MGH,

Greene's workshop materials contained the following statement, or one substantially similar:

> Dr. Greene donates a portion of the honoraria he receives to the non-profit **Collaborative Problem Solving Institute,** based in the Department of Psychiatry at Massachusetts General Hospital.  For information about the current and planned initiatives of the CPS Institute, or to learn how make a charitable donation, visit www.massgeneral.org/cpsinstitute.

Exhibit 10PW (Doc. 62-2) to Plaintiff's Dissection Brief, p. RG 2640 (emphasis in

original); *see* Exhibit 34PW (Doc. 69) to Plaintiff's Dissection Brief, p. RG 2724.

**Greene's Acknowledgment of MGH's Rights in the Think:Kids Marks**

56.    On January 25, 2009, Greene sent his lawyer an email stating, in part:

> Stuart Ablon and I previously applied for supplemental registers for the
> marks "Think:Kids" and "Think:Kids: Rethinking Challenging Kids" in
> the name of the Center for Collaborative Problem Solving (the
> corporation).  Having now read [the] MGH IP policy several dozen times,
> I'm convinced the Center doesn't have rights to the marks . . . but
> apparently MGH and Stuart may feel that I have some leverage there, as
> my attorney and theirs have been discussing a trade of trademarks.

King Aff., ¶ 5.

**Registration of the Marks**

*Greene's Registration of "Collaborative Problem Solving Approach" on the
Supplemental Register*

57.    On or about October 10, 2001, an application was filed on Greene's behalf with

the  United States Patent and Trademark Office ("USPTO") seeking to register the mark

"Collaborative Problem Solving Approach" on the principal register.  King Affidavit, ¶ 34.a, b.

Registration was denied on the ground that the mark was merely descriptive.  *Id.,* ¶ 34.b.  The

application was later amended to seek registration of the service mark on the supplemental

register.  *Id.,* ¶ 34.c.  The mark was registered on the supplemental register on July 9, 2002.  *Id.,*

¶ 34.d.

*CCPSI's Registration of "Think:Kids: Rethinking Challenging Kids" on the Principal
Register*

58.    On or about February 12, 2007, an application was filed on behalf of the Center

for Collaborative Problem Solving, Inc. ("CCPSI") to register the mark "Think:Kids: Rethinking

Challenging Kids" on the principal register.  *Id.,* ¶ 41.a.  CCPSI was represented by an attorney

named Parker Bagley, Esq.

59.    CCPSI is a Massachusetts corporation formed in 2003.  Amended Verified

Complaint (Doc. 7), ¶ 38.  Greene and Ablon were and are the sole stockholders and directors.

At all times during the corporation's existence, Greene has served as its President.  *Id.,* ¶¶ 99-100; Defendant J. Stuart Ablon's Answer to Amended Complaint (Doc. 17), p. 1.

60.     The specimen submitted by CCPSI in support of its Statement of Use consists of computer screen shots of pages from the MGH Think:Kids website.  King Aff., ¶ 41.d.

61.     The mark "Think:Kids: Rethinking Challenging Kids" was registered on the principal register on December 14, 2010.  *Id.,* ¶ 41.f.

*CCPSI's Registration of "Think:Kids" on the Principal Register*

62.     On or about May 17, 2007, an application was filed on behalf of CCPSI to register the service mark "Think:Kids" on the principal register.  *Id.,* ¶ 40.a.  CCPSI was represented by an attorney named Parker Bagley, Esq.

63.     The specimen submitted by CCPSI in support of its Statement of Use consists of pages from the MGH Think:Kids website printed on November 30, 2010, *id.,* ¶ 40.f. -- twenty two months after Greene alleges under oath that MGH terminated his employment.  Amended Verified Complaint (Doc. 7), ¶ 69 ("On January 15, 2009, MGH terminated Dr. Greene's employment.").

64.     The mark "Think:Kids" was registered on the principal register on January 25, 2011.  King Aff., ¶ 40.h.

*Greene's Attempted Registration of "The Collaborative Problem Solving Approach" on the Principal Register.*

65.     On or about February 15, 2008, an application was filed on Greene's behalf to register the mark "Collaborative Problem Solving Approach" on the principal register.  *Id.,* ¶ 36.a.  The application was subsequently amended to seek registration of the mark "The Collaborative Problem Solving Approach," *i.e.,* adding the word "The" to the mark.  *Id.,* ¶ 36.c.

66.     Registration was initially denied on the ground that the mark was merely descriptive. *Id.*, ¶ 36.b  In response, Greene submitted his own affidavit in which he claimed that the mark "has had substantially exclusive use in commerce as my service mark in connection with my model of care, educational services and workshops for a period well exceeding the five (5) years next preceding the filing of the application on February 15, 2008."

*Id.*, ¶ 36.c.  More specifically, Greene stated that the CPS Marks had:

> become distinctive when used in connection with services covered in my application, specifically "educational services, namely conducting seminars and workshops directed to psychologists, psychiatrists, parents, health care professionals and other education professionals in the field of child and adolescent behavior problems."

*Id.*  Greene's affidavit failed to mention the use of the mark in connection with the MGH CPS Institute for the preceding six years.

67.     Attached as Exhibit A to Greene's affidavit were copies of numerous brochures and applications for conferences and workshops at which Greene had presented.  *Id.*  None of these materials relate to presentations given on behalf of the CPS Institute at MGH, although many of them identify Greene as the Director of the CPS Institute within the MGH Department of Psychiatry.  *Id.*  One brochure notes that "Ross Greene and his colleagues at Massachusetts General Hospital in Boston have pioneered a practical approach-called the Collaborative Problem Solving (CPS) Approach-to work with such youths at home and school . . . ."  *Id.*

68.     Attached as Exhibit B to Greene's affidavit was a single article referencing the "Collaborative Problem Solving (CPS) Approach."  *Id.*

69.     Attached as Exhibit C to Greene's affidavit were form declarations from seventeen individuals who professed to "have been involved in the educational and mental health fields."  *Id.*  None of the declarants claims to be a consumer of the services with which Greene allegedly had associated the CPS Marks.  Each simply states with respect to each of the CPS

Marks that "due to long and extensive use of the mark . . . by Dr. Greene, I believe that those in my field have come to associate this mark exclusively with Dr. Greene." *Id.*

70.    MGH has filed an Opposition to Greene's registration of the mark "The Collaborative Problem Solving Approach" on the principal register. *Id., ¶* 37.

*Greene's Attempted Registration of "Collaborative Problem Solving" on the Principal Register.*

71.    On or about February 15, 2008 an application was filed on Greene's behalf to register the mark "Collaborative Problem Solving" on the principal register. *Id., ¶* 38.a.

72.    Registration was initially denied on the ground that the mark was merely descriptive. *Id., ¶* 38.b  In response, Greene submitted his own affidavit in which he claimed that the mark "has had substantially exclusive use in commerce as my service mark in connection with my model of care, educational services and workshops for a period well exceeding the five (5) years next preceding the filing of the application on February 15, 2008." *Id., ¶* 38.c.  More specifically, Greene stated that the CPS Marks had:

> become distinctive when used in connection with services covered in my application, specifically "educational services, namely conducting seminars and workshops directed to psychologists, psychiatrists, parents, health care professionals and other education professionals in the field of child and adolescent behavior problems."

*Id.*  Greene's affidavit failed to mention the use of the mark in connection with the MGH CPS Institute for the preceding six years.

73.    Attached as Exhibit A to Greene's affidavit were copies of numerous brochures and applications for conferences and workshops at which Greene had presented. *Id.*  None of these materials relate to presentations given on behalf of the CPS Institute at MGH, although many of them identify Greene as the Director of the CPS Institute within the MGH Department of Psychiatry. *Id.*

GSDOCS\2038830.6

74.     Attached as Exhibit B to Greene's affidavit were several articles and letters to the editor referencing the "Collaborative Problem Solving." *Id.*

75.     Attached as Exhibit C to Greene's affidavit were form declarations from seventeen individuals who professed to "have been involved in the educational and mental health fields." *Id.*  None of the declarants claims to be a consumer of the services with which Greene allegedly had associated the CPS Marks.  Each simply states with respect to each of the CPS Marks that "due to long and extensive use of the mark . . . by Dr. Greene, I believe that those in my field have come to associate this mark exclusively with Dr. Greene." *Id.*

76.     MGH has filed an Opposition to Greene's registration of the service mark on the principal register. *Id.,* ¶ 39.

Respectfully submitted,

THE GENERAL HOSPITAL CORPORATION
D/B/A MASSACHUSETTS GENERAL
HOSPITAL

By its attorneys,


_____*/s/ Denis M. King*_____
Thomas J. Sartory (BBO No. 442500)
Denis M. King (BBO No.555838)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
Dated:  February 8, 2012          (617) 482-1776

24

## Certificate of Service

As required by the paragraph E of the Electronic Case Filing Administrative Procedures in effect in this District, dated January 1, 2006, I hereby certify that this document, filed through the ECF system, will be sent electronically to the attorney of record for each party in this action, each of whom is a registered participant as identified on the Notice of Electronic Filing (NEF) this 8th day of January 2012.

                                    */s/ Denis M. King*
                              Denis M. King

GSDOCS\2038830.6