# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                    )
ROSS GREENE,                        )
                                    )
      Plaintiff,               )
                                    )
      v.                       )      **Civil Action No. 09-10937-DJC**
                                    )
J. STUART ABLON and                 )
GENERAL HOSPITAL CORPORATION        )
d/b/a                               )
MASSACHUSETTS GENERAL HOSPITAL,     )
                                    )
      Defendants.              )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                      September 17, 2012

## I.      Introduction

Plaintiff Dr. Ross Greene ("Greene") has filed suit against Defendant Dr. J. Stuart Ablon ("Ablon") and Defendant General Hospital Corporation d/b/a Massachusetts General Hospital ("MGH"). Greene's amended verified complaint asserts claims against Ablon for copyright infringement under federal law (Counts I and II), breach of fiduciary duty (Count IV), unjust enrichment (Count V), tortious interference with advantageous business relations (Count VI) conversion (Count VII), and unfair competition (Count XIII); includes a claim against both Ablon and MGH for trademark infringement under federal law (Count X); and seeks relief in the form of an accounting from Ablon (Count III), judicial dissolution of a corporation – the Center for Collaborative Problem Solving, Inc. ("CPS Center" or "Center") – that is jointly owned and directed by Greene and Ablon (Count VIII), injunctive and declaratory relief against both Ablon and MGH

1

(Counts XI and XII) and damages. MGH has filed counterclaims for trademark infringement (Count 1), false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count 2), unfair competition (Count 3), and declaratory judgment related to trademark rights (Count 4) against Greene.[1]  Currently before the Court are Ablon's motion for partial summary judgment with regard to aspects of Counts I and II, MGH's motion for partial summary judgment with regard to Count X, aspects of Count XII, and Count 4 of MGH's counterclaims, and several motions to strike supporting affidavits and to preclude reliance on belatedly produced discovery. For the reasons set forth below, Ablon's motion for partial summary judgment is GRANTED in part and DENIED in part and MGH's motion for partial summary judgment is GRANTED.

## II.      Burden of Proof and Standard of Review

### A.      Motions for Summary Judgment

Summary judgment is only appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment on a given issue as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing the basis for its motion and identifying where there exists a lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A "genuine" issue of fact exists when the evidence is, "viewed in the light most flattering to the party opposing the motion, . . . sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995) (citation omitted). If the nonmovant bears the burden of proof on the underlying dispositive issue, the nonmovant "must point to 'competent

---

[1] Ablon also filed counterclaims against Greene, D. 17 at 4-9, however, none of these counterclaims are at issue in the pending motions addressed by this Memorandum and Order.

evidence' and 'specific facts' to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (citation omitted).

### B.    Motions to Strike or Preclude

A party may move to strike part or all of an affidavit in support of, or in opposition to, a motion for summary judgment if the party's objection is that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Moreover, Federal Rule of Civil Procedure 37(c)(1) which precludes evidence not properly produced in discovery, "applies with equal force to motions for summary judgment." Lohnes v. Level 3 Commc'ns, Inc., 272 F.3d 49, 60 (1st Cir. 2001). That is, in connection with a summary judgment motion, a party may be precluded from relying on evidence where he fails to comply with discovery requirements under the Federal Rules and his failure to comply is not substantially justified or the failure to do so was not harmless. Fed. R. Civ. P. 37(c)(1); see Hip Saver Co., Inc. v. J.T. Posey Co., 497 F. Supp. 2d 96, 103 (D. Mass. 2007). In its analysis, the Court considers a number of factors including: "the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation." Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197 (1st Cir. 2006) (internal citation omitted).

### III.    Factual Background

Unless otherwise noted, the facts cited in this section are undisputed.

### A.    Before Greene Met Ablon

In 1993, Greene created a treatment approach for collaboratively resolving problems between children with social, emotional and behavioral challenges and their caregivers. The approach, which

focused on the children's lagging skills, came to be known as the Collaborative Problem Solving Approach ("CPS Approach" or "Approach").  Am. Ver. Compl., D. 7 at ¶ 9; Greene Aff., D. 58-1 at ¶¶ 3-4.[2]

In July 1993, Greene became an instructor and researcher at Harvard Medical School and began working part-time as a clinical assistant in psychology at MGH, using the CPS Approach as part of his outpatient therapy services.  Am. Ver. Compl., D. 7 at ¶ 10; Weinstein Aff., D. 102 at ¶¶ 2, 6.  As part of his application to work at MGH, Greene agreed to abide by MGH's bylaws, rules, regulations and policies and acknowledged that he had received and had an opportunity to read the bylaws specifically relating to MGH's professional staff.  Weinstein Aff., D. 102 at ¶¶ 5-7.  Also in July 1993, Greene opened a private therapy practice unaffiliated with MGH or any other medical or educational institution.  Am. Ver. Compl., D. 7 at ¶ 10.

On July 1, 1994 and again on January 1, 1995, Greene successfully reapplied for his position at MGH, again agreeing to abide by MGH policies.  Weinstein Aff., D. 102 at ¶¶ 8-13.

On January 1, 1997, Greene again successfully reapplied for his position at MGH, agreeing once again to abide by MGH policies.  Weinstein Aff., D. 102 at ¶¶ 14-16.  As of January 1, 1997, MGH had in effect an intellectual property policy originally adopted on April 21, 1995 ("1995 IP Policy").  Clark Aff., D. 97 at ¶ 5.  Under the terms of that policy, "[t]rademarks shall be owned by MGH if they are created by [professional staff] Members in the course of their employment or

_____

[2] Ablon alleges that it was only years later, when both Greene and Ablon were working at MGH, that Greene and Ablon began discussing names for the approach, and that Greene and Ablon together settled on the name "Collaborative Problem Solving."  Ablon Aff., D. 78 at ¶ 11; see D. 60 at 11 (preface to the third edition of The Explosive Child, published in 2005, stating that "much has happened since the first edition was published in 1998.  To begin with, the approach described in these pages has a name: Collaborative Problem Solving").

affiliation with an [MGH-affiliated] Institution or if they are used to identify any product or service originating with or associated with [such] an Institution," Clark Aff., D. 97 at ¶ 9 (quoting Section 14.0 of the 1995 IP Policy, D. 97-6 at 10), and "[a]ny Intellectual Property not specifically covered by the [express terms of the 1995 IP Policy] shall be owned by an [MGH-affiliated] Institution if it is created in the performance of Sponsored or Supported Activity at that Institution," Clark Aff., D. 97 at ¶ 10 (quoting Section 16.0 of the 1995 IP Policy, D. 97-6 at 10), with "Supported Activity" defined as "activity that receives direct or indirect financial support from an [MGH-affiliated] Institution" and "Sponsored Activity" defined as "any activity that is subject to a grant, contract or other arrangement between an [MGH-affiliated] Institution and a third party." Clark Aff., ¶ 11 (quoting the glossary of the 1995 IP Policy, D. 97-6 at 15).[3]

In 1997 and 1998, Greene wrote a book entitled <u>The Explosive Child: A New Approach for Understanding and Parenting Easily Frustrated "Chronically Inflexible" Children</u> ("<u>The Explosive Child</u>"). Am. Ver. Compl., D. 7 at ¶¶ 13-15. The intended audience of this book was the children's "adult caregivers at home and in school." D. 60 at 13. <u>The Explosive Child</u> was published by Harper Collins on September 4, 1998. Am. Ver. Compl., D. 7 at ¶ 15. Greene holds the exclusive copyright to <u>The Explosive Child</u>; the copyright was registered with the U.S. Copyright Office on October 5, 1998. D. 59. Greene also holds registered copyrights to the second, third and fourth

---

[3] Greene successfully reapplied for positions at MGH on November 5, 1998, November 5, 1999, November 5, 2001, November 5, 2003, November 5, 2005, and November 5, 2007, each time agreeing to abide by MGH policies. Weinstein Aff., D. 102 at ¶¶ 17-36. The 1995 IP Policy was in effect until July 19, 2002, Clark Aff., D. 97 at ¶ 5, at which point it was replaced by a subsequent policy (the "2002 IP Policy") that combined the concepts of "Sponsored Activities" and "Supported Activities" under the blanket term "Institutional Activities" but did not significantly alter the allocation of intellectual property rights between MGH and professional staff members such as Greene. Clark Aff., D. 97 at ¶ 12-17. The 2002 IP Policy remained in effect as recently as January 2012. Clark Aff., D. 97 at ¶ 12.

editions of <u>The Explosive Child</u>, which were registered in 2001, 2005 and 2010, respectively.  D. 59-4, 60-3, 61-3.  Greene also created a series of slides summarizing and excerpting content from various editions of <u>The Explosive Child</u>.  D. 62-1, 62-2, 62-4, 67-3, 68-1, 69, 69-2.  Greene does not hold a registered copyright to these slides.[4]

### B.    Greene and Ablon

In 1998, Greene met Ablon.  Greene Aff., D. 58-1 at ¶ 13.  Ablon was a post-doctoral fellow in MGH's psychology internship program; Greene was the principal investigator for a study at MGH testing the clinical treatment ideas associated with the CPS Approach and supervised Ablon's work on the study.  Greene Aff., D. 58-1 at ¶ 13; Ablon Aff., D. 78 at ¶ 9; King Aff., D. 98 at ¶ 12.  As their relationship grew, Ablon rented office space from Greene from which both Greene and Ablon ran private practices while on staff at MGH.  Ablon Aff., D. 78 at ¶ 9.  Greene and Ablon worked together to disseminate the CPS Approach and Greene referred patients and speaking engagement opportunities to Ablon.  Greene Aff., D. 58-1 at ¶¶ 14, 16.

In 2001, an application was filed on Greene's behalf with the United States Patent and Trademark Office ("USPTO") seeking to register the mark "Collaborative Problem Solving Approach" on the principal register.  King Aff., D. 98 at ¶ 34.  Registration was denied on the ground that the mark was merely descriptive.  King Aff., D. 98 at ¶ 34(b).  The mark was subsequently registered on the supplemental register.  King Aff., D. 98 at ¶ 34(d).

In 2002, Greene and Ablon jointly founded the Collaborative Problem Solving Institute ("CPS Institute at MGH," "CPS Institute" or the "Institute") as a part of MGH's Department of

---

[4] <u>See</u> Greene Brief, D. 103 at 7 (stating that Ablon alleges "that [Greene's] [s]lides are not separately and independently registered with the Copyright Office," and conceding that "[t]hat fact is true").

Psychiatry.  Ablon Aff., D. 78 at ¶¶ 3, 6; Rosenbaum Aff., D. 100 at ¶ 2.  The CPS Institute at MGH relied on MGH's non-profit status and MGH's development office to solicit tax-deductible contributions, Rosenbaum Aff., D. 100 at ¶ 2; King Aff., D. 98 at ¶ 47; Taylor Aff., D. 101 at ¶¶ 2-11, and donations to the Institute were held in an MGH-administered fund.  Taylor Aff., D. 101 at ¶ 11.  The MGH logo was located on the Institute's website.  Website Archive, D. 98-11 at 2-7.  Greene served as the Institute's director.  King Aff., D. 98 at ¶ 26.

Also in 2002, Greene and Ablon incorporated the CPS Clinic, Incorporated ("CPS Clinic" or "Clinic"), with Greene and Ablon each serving as co-director and each owning 50% of the Clinic's stock.  Ablon Aff., D. 78 at ¶ 18.  In 2003, Greene and Ablon incorporated the CPS Center, again with Greene and Ablon each serving as co-director and each owning 50% of the corporation's stock.  Ablon Aff., D. 78 at ¶ 18.  Through these organizations, Greene and Ablon provided trainings, seminars, workshops and consulting services, and created and distributed DVDs and other training materials, all using and promoting the CPS Approach.  Ablon Aff., D. 78 at ¶ 19.  To facilitate the various training sessions and seminars they presented, Greene and Ablon showed PowerPoint slides to trainees and seminar participants.  Ablon Aff., D. 78 at ¶¶ 23-24.  Greene and Ablon jointly and incrementally refined these slides over many years.  Ablon Aff., D. 78 at ¶ 24.

By no later than early 2002, Greene and Ablon had prepared a prospectus of a book with the proposed title "Collaborative Problem Solving: A Cognitive Theory in Treatment of Oppositional Defiant Disorder."  Ablon Aff., D. 78 at ¶ 32; Prospectus, D. 78-13 at 2.  According to the prospectus, the book was "geared toward clinicians actively trying to implement the CPS model with their patients."  Prospectus, D. 78-13 at 2.  Greene avers that "the work as originally conceived was anticipated to be a genuine work of co-authorship."  Am. Ver. Compl., D. 7 at ¶ 34.

On April 17, 2002, Greene and Ablon signed a contract with Guilford Publications ("Guilford") to publish the book described in the prospectus, now re-titled <u>Treating Explosive Kids: The Collaborative Problem Solving Approach</u> ("<u>Treating Explosive Kids</u>").   Ablon Aff., D. 78 at ¶ 33; Contract, D. 78-14.   The contract identified both Greene and Ablon as the book's author. Contract, D. 78-14 at 10.   A handwritten edit to the contract made at Greene and Ablon's request states that Guilford would register the book's copyrights "in the Author's [sic] names."   Contract, D. 78-14 at 3.   The contract also referred to a second book, geared towards "educators for implementing Collaborative Problem Solving in schools and classrooms," on which Greene and Ablon were working at the time.   Contract, D. 78-14 at 3.

The parties dispute the extent of Ablon's actual contribution to <u>Treating Explosive Kids</u>. <u>Compare</u> Am. Ver. Compl., D. 7 at ¶ 33 (asserting that "Ablon's actual contribution to the work was less than fifteen pages in a work of 226 pages of text") <u>and</u> Greene Aff., D. 58-1 at ¶ 27 (same) <u>with</u> Ablon Aff., D. 78 at ¶ 34 (stating that Ablon "submitted most if not all of the treatment vignettes" that appear on "about 145 pages of the book," "took the lead in writing Chapter 8 . . . which wound up being 25 pages long," "wrote significant portions of other portions of the book," and "reviewed and made suggestions for many other sections"); <u>see also</u> Greene Aff., 58-1 at ¶ 24 (stating that "we decided that he (Dr. Ablon) would contribute as original material some treatment vignettes describing some treatment interactions he had encountered, since vignettes of this type would not be derived from any of my preexisting works, and that these would be his only significant contribution").

On October 18, 2005, <u>Treating Explosive Kids</u> was published.   Copyright Catalog Printout, D. 79-1 at 2; Registered Copyright, D. 84-3 at 3.   Contrary to the terms of its contract with Greene

and Ablon, Guilford claimed the copyright for <u>Treating Explosive Kids</u> for itself. Copyright Catalog

Printout, D. 79-1 at 2; Registered Copyright, D. 84-3 at 3.  The registered copyright does list Greene

and Ablon as the book's authors, <u>id.</u>, and Greene and Ablon are identified as co-authors at various

locations in the book itself.  <u>See</u> <u>Treating Explosive Kids</u> (third ed.), D. 78-1 at 2 (cover page), 3

(front flap), 4 (back flap), 6 (first page), 9-10 ("About the Authors" section); <u>see also</u> <u>id.</u> at 11, D.

78-3 at 65-66 (Acknowledgments and Epilogue sections, each using the terms "we" or "us" when

using an authorial tone).

Consistent with the terms of their 2002 contract with Guilford, Greene and Ablon worked

on a book discussing the application of the CPS Approach in schools.  Ablon Aff., D. 78 at ¶ 38.

At some point, however, Greene asked Ablon to remove his name from the book, leaving Greene

as the sole listed author, and Ablon agreed.  Ablon Aff., D. 78 at ¶ 38.

Ablon asserts that in 2007, he and Greene, with assistance from marketing and branding

professionals hired through and ultimately paid by MGH, rebranded the CPS Institute at MGH under

the name "Think:Kids."  Ablon Aff., D. 78 at ¶ 6.  A website established by the rebranded Institute

stated that "Think Kids is an initiative of the nonprofit Collaborative Problem Solving Institute in

the Department of Psychiatry at Massachusetts General Hospital, Boston, Massachusetts."  King

Aff., D. 98 at ¶ 46(b).  The Institute (acting under the name Think:Kids) also published a newsletter

that stated "Think:Kids is an initiative of the CPS Institute, Department of Psychiatry."  King Aff.,

D. 98 at ¶ 6.

On February 12, 2007, an application was filed on behalf of the CPS Institute at MGH to

register the mark "Think:Kids: Rethinking Challenging Kids" on the USPTO's principal register.

King Aff., D. 98 at ¶ 41.  On May 17, 2007, an application was filed on behalf of the Institute to register the mark "Think:Kids" on the principal register.  King Aff., D. 98 at ¶ 40.[5]

In December of 2007, Greene and Ablon merged the CPS Clinic into the CPS Center, leaving the Center as the sole private, MGH-unaffiliated organization run by Greene and Ablon.  Ablon Aff., D. 78 at ¶ 18.

### C.    Conflict Between Greene and Ablon

By early 2008, Greene and Ablon were working to improve their relationship, which had become conflicted and required work through attorneys and by a mediator.  Ablon Aff., D. 78 at ¶ 39.

On February 15, 2008, Greene again attempted to register the marks "Collaborative Problem Solving" and "Collaborative Problem Solving Approach" on the USPTO's principal register.  King Aff., D. 98 at ¶¶ 36, 38.  The application for the latter mark was subsequently amended to add the word "The" at the beginning of the mark.  King Aff., D. 98 at ¶ 36(c).  Registration was denied on the ground that the marks were merely descriptive.  King Aff., D. 98 at ¶¶ 36(b), 38(b).  Greene filed responses arguing that the marks had substantially exclusive use in commerce as a service mark in connection with "my model of care," but did not mention any affiliation between the marks and MGH.  King Aff., D. 98 at ¶¶ 36(c), 38(c).  MGH has filed oppositions to Greene's efforts to register these two marks.  King Aff., D. 98 at ¶¶ 37, 39.

---

[5] The former mark was registered on the USPTO's principal register on December 14, 2010, and the latter mark was registered on the principal register on January 25, 2011.  King Aff., D. 98 at ¶¶ 40(g), 41(f).

In November of 2008, Ablon resigned from the CPS Center.  Ablon Answer, D. 17 at ¶ 22.

By the end of that year, Ablon began working full-time as the Director of MGH's Think:Kids

program.  Ablon Aff., D. 78 at ¶ 40.

On January 15, 2009, MGH terminated Greene's employment.  Am. Ver. Compl., D. 7 at ¶

69.

## IV.    Procedural Background

Greene filed his initial verified complaint in this case on June 4, 2009.  D. 1.  He filed an

amended verified complaint on July 7, 2009.  D. 7.[6]  Ablon filed his answer to the operative

complaint on September 21, 2009.  D. 17.   MGH did the same (along with counterclaims) on

September 29, 2009.  D. 19.

After a period of (unsuccessful) attempts to mediate this matter (for which this Court allowed

suspension of various deadlines in the case from March 16, 2011 until July 11, 2011 to allow the

parties to pursue mediation, D. entry for 3/16/11; D. 43; D. entry for 5/11/11), litigation resumed.

D. entry for 7/11/11.

On September 30, 2011, Greene filed a dissection brief regarding protectable expression for

his copyright infringement claims against Ablon.  D. 58.  Ablon filed his response on November 30,

2011.  D. 77.  Counsel for these parties agreed at the July 19, 2012 motion hearing that it is not yet

appropriate for the Court to engage in dissection analysis, but that materials submitted by the parties

in support of their dissection briefs may be referenced by the Court in resolving the ripe summary

---

[6] On September 22, 2009, Greene stipulated to the dismissal of Count IX of the Amended
Complaint that had alleged that Ablon had violated Mass. Gen. L. c. 93A.  D. 18.

judgment motions and motions to strike or preclude set forth below that are presently before the Court.

On November 28, 2011, Greene moved to preclude certain discovery that Ablon had produced after Greene had filed his September 20, 2011 dissection brief and after the purported close of discovery.  D. 74.

On January 18, 2012, Ablon moved for partial summary judgment with regard to aspects of Greene's copyright infringement claims (Counts I and II).  D. 90.

On February 8, 2012, MGH moved for partial summary judgment with regard to Greene's trademark infringement claim (Count X), his request for declaratory relief (Count XII) to the extent that request sought a declaration that MGH had misused trademarks owned by Greene and as to Count 4 of MGH's counterclaim against Greene for declaratory judgment regarding trademark rights.  D. 94.

On April 10, 2012, MGH moved to strike portions of an affidavit Greene had submitted in support of his opposition to MGH's partial summary judgment motion.  D. 109.[7]  On June 11, 2012, Greene moved to strike portions of an affidavit Ablon had submitted in support of his response to

---

[7] MGH reiterated some of the arguments raised in its motion to strike in a May 14, 2012 filing styled as a "Motion for Sanctions to Preclude Use of Evidence."  D. 113.  On June 7, 2012, the Court granted the May 14, 2012 motion for the purposes of summary judgment proceedings and reserved ruling on whether the contested portions of the affidavit would be precluded in the event of trial.  D. 120.  In a June 14, 2012 filing, MGH noted that "while a substantial portion of the [April 10, 2012] motion to strike has been rendered moot by this Court's order of June 7, 2012 . . . there remain portions of [Greene's] March 20, 2012 Affidavit that do not comply with Fed. R. Civ. P. 56(c)(4)," D. 132 at 2, sought leave for MGH to file a supplementary brief in support of its April 10, 2012 motion to strike, D. 132 at 1-2, and attached a copy of its proposed supplementary brief.  D. 132-1.  Leave to file a supplementary brief is hereby GRANTED; the Court has considered MGH's supplementary brief in connection with the Court's review of the April 10, 2012 motion to strike.

Greene's dissection brief.  D. 125.  On June 12, 2012, Greene moved to strike portions of an affidavit MGH counsel Denis King ("King") had submitted in support of MGH's motion for partial summary judgment.  D. 129.  On June 21, 2012, Ablon moved to strike portions of an affidavit Greene had submitted in support of his opposition to Ablon's partial summary judgment motion. D. 137.

On July 19, 2012 the Court held a hearing on the various pending motions and took those motions under advisement.[8]  D. 149.

## V.      Discussion

### A.      Ablon's Motion for Partial Summary Judgment

Ablon's motion for partial summary judgment, D. 90, raises four distinct issues, each of which the Court will address in turn.  Both Greene and Ablon have filed motions to strike some of the record materials underlying Ablon's motion for summary judgment, which the Court addresses first.  D. 125, 137.

#### 1.      Motions to Strike

Greene seeks to strike certain paragraphs in the Ablon's November 30, 2011 affidavit, D. 78, on the ground that some of the information therein should have been provided via answers to interrogatories or supplementary discovery rather than in an affidavit filed after the close of discovery.  Greene Mem., D. 126 at 3-10.  But after initially seeking supplementary interrogatory

---

[8] Additionally, on August 6, 2012, the parties jointly moved to add the CPS Center as a co-plaintiff on Greene's declaratory relief claim (Count XII) and as a co-defendant on one of MGH's counterclaims in order to permit the Court to accord complete relief with regard to the trademark dispute between Greene, MGH and the CPS Center.  D. 150.  The Center consented to the motion.  Id.  The joint motion is hereby GRANTED.  MGH's prior motion to add the Center, D. 140, is DENIED AS MOOT.

answers regarding the information at issue, Greene appears to have abandoned his request for supplementation of Ablon's answers to interrogatories in the course of post-discovery discussions with Ablon.  Greene Mem., D. 126 at 2-3 (discussing agreement reached on December 15, 2010 that Ablon would supplement his answers to only one interrogatory); Ablon Mot., D. 137 at 2-4 (same).  Even if he did not, both the belated timing of Greene's motion (filed nearly a year and a half after Ablon provided his supplementary response, six months after Ablon filed the affidavit at issue, and five months after Ablon moved for partial summary judgment) and the fact that Greene has already filed an affidavit, Greene Aff., D. 85, in response to the Ablon affidavit at issue undercut Greene's ability to show the harm and prejudice necessary to support this motion to strike.[9]  Accordingly, Greene's motion to strike, D. 125, is DENIED.

Ablon seeks to strike two sentences from Greene's September 30, 2011 Affidavit that purport to recount an exchange between Greene and the literary agent he shared with Ablon, D. 58-1 at ¶ 22, on the ground that the purported statements of the literary agent are inadmissible hearsay.  D. 137 at 8 (citing Fed. R. Civ. P. 56(c)(2)).  The Court agrees with Ablon's objection and the Court has not relied upon the two sentences regarding the alleged statements of the literary agent in reaching its decision on Ablon's motion for partial summary judgment.  Accordingly, Ablon's motion to strike, D. 137, is ALLOWED.

---

[9] Greene argues that the logic of this Court's June 7, 2012 Order, D. 120, striking portions of Greene's March 30, 2012 affidavit, D. 107, suggests that the Court should grant Greene's instant motion to strike.  Greene Mem., D. 126 at 9-10.  The two motions are not substantively similar.  The June 7, 2012 Order involved an attempt by Greene to introduce declarations regarding a new theory of liability – of which MGH had no notice – based on a purported oral agreement between Greene and MGH that Greene had never previously mentioned.  The subject of Greene's motion to strike is quite different, particularly in regard to any prejudicial effect given the parties' prior discovery conference and agreement about this matter, the nature of information contained in the affidavit and the timing of its disclosure.

The Court will now turn to the various issues raised by Ablon's motion for partial summary judgment.

### 2.        The CPS Approach, as a Concept, is not Copyright Protectable

First, as both parties agree, copyright law protects only the expression of an idea or concept, not the underlying idea or concept itself.   17 U.S.C. § 102(b) (stating that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work"); Harper & Row Pubs., Inc. v. Nation Enters., 471 U.S. 539, 556-57 (1985) (stating that "[n]o author may copyright his ideas or the facts he narrates . . . . [b]ut copyright assures those who write and publish . . . that they may at least enjoy the right to market the original expression contained therein").   Accordingly, here, the CPS Approach itself is not protectable under copyright law, but specific expressions of that Approach – for example, those found in various editions of The Explosive Child – may be protectable. Ablon's motion for partial summary judgment is thus GRANTED to the extent that Greene's copyright infringement claim in Count I of the Amended Verified Complaint, D. 7 at ¶¶ 80-86, must be predicated on specific expressions of the CPS Approach, and may not be predicated on the CPS Approach as a concept.

### 3.        Greene's Claims Must Be Based on Expressions in *The Explosive Child*, Not Expressions Found Solely in the Related Slide Show Presentation

Second, because Greene has a valid registered copyright for The Explosive Child but does not have a registered copyright for the slide show presentations he claims to have derived from The Explosive Child, his claims for copyright infringement must be based on protectable expressions in The Explosive Child, and not from material solely in the slides themselves.  See, e.g., 2 M. Nimmer

& D. Nimmer, Nimmer on Copyright § 7.16[B][5][b], pp. 7-185, 7-186, 7-186.1 (2011) (discussing the separate registration of a pre-existing work contained in a derivative work and the effect of registering only the underlying work ); <u>Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.</u>, 210 F. Supp. 2d 147, 158 (E.D.N.Y. 2002) (stating that "where the pre-existing work is registered, and the derivative work is not, a suit for infringement may be maintained as to any protected element contained in the registered pre-existing work, but not as to any element original to the unregistered derivative work"), <u>aff'd</u>, 354 F.3d 112 (2d Cir. 2003) (cited in Nimmer, <u>supra</u>, at § 7.16[B][5][b], pp. 7-186, 7-186.1).  Of course, as Ablon concedes, D. 93 at 10, Greene may assert claims for copying protectable expressions in the book that he subsequently incorporated into the slides, as long as he identifies for the Court the underlying protectable work in the book, isolates the aspects of that work he incorporated into the slides and points to the location of that work within the slides. Ablon's motion for partial summary judgment is thus GRANTED to the extent that Greene's copyright infringement claim in Count I of the Amended Verified Complaint, D. 7 at ¶¶ 80-86, must be predicated on specific expressions contained in <u>The Explosive Child</u>, and may not be predicated on expressions in the related slide presentations unless those expressions can be traced back to <u>The Explosive Child</u>.

### 4.    Ablon Cannot "Conspire" With His Employer, MGH

Although Greene's Amended Verified Complaint does not include any counts of conspiracy, Am. Ver. Compl., D. 7 at ¶¶ 80-155, it does specifically allege that Ablon "conspired with MGH and the [CPS] Institute [at MGH] to permit those entities to use the content of <u>The Explosive Child</u> . . . in derogation of Dr. Greene's copyrights."  Am. Ver. Compl. ¶ 84.  Massachusetts law recognizes two types of civil conspiracy:  first, coercive or so-called "true" conspiracy, <u>Taylor v.</u>

Am. Chem. Council, 576 F.3d 16, 34 (1st Cir. 2009), under which a plaintiff must show "that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently," Aetna Cas. Sur. Co. v .P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994) (quotations and citations omitted), and second, "concerted action" conspiracy, which "is more akin to a theory of common law joint liability in tort" and which requires a plaintiff to show both "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act" and "proof of some tortious act in furtherance of the agreement." Id. at 1564. In the context of copyright law, "[g]iven that conspiracy by definition requires an agreement by two or more individuals or entities to commit an unlawful act, and given the applicable rules of *respondeat superior*, it has been held that employees or officers acting on behalf of a corporation cannot conspire with that corporation." 3 Nimmer, supra, at § 12.04[D][3], p. 12-137.

Here, even if, as Greene argues, some of Ablon's allegedly infringing conduct occurred outside the scope of his employment with MGH, see Greene Brief, D. 103 at 7-8 and 8 n.10, Greene neither alleges nor points to any evidence in the record showing that any such conduct was either the result of Ablon and MGH either "acting in unison" or acting pursuant to "a common design or agreement." Aetna, 43 F.3d at 1563-64.[10] Accordingly, to the extent the Amended Verified

---

[10] In support of his conspiracy claim, Greene specifically points to six paragraphs in the Amended Verified Complaint and to four paragraphs in the November 29, 2011 Ablon Affidavit. Greene Brief, D. 103 at 8 n.10. Each of these ten paragraphs discusses activities Ablon undertook jointly with Greene; none of them discusses in any detail conduct jointly undertaken by Ablon and MGH. See Am. Ver. Compl., D. 7 at ¶¶ 22 (discussing Greene's mentorship of Ablon), 23 (discussing Greene and Ablon's business relationship focused on disseminating the CPS Approach), 26 (discussing Greene referring patients to Ablon and sharing PowerPoint slides with Ablon), 27 (discussing Greene inviting Ablon to participate in providing trainings regarding the CPS Approach), 36 (discussing Greene and Ablon's joint formation of the CPS Clinic), 38

Complaint seeks to hold Ablon liable under a legal theory of conspiracy, Greene has failed to

identify competent evidence and specific facts that could establish Ablon's liability under that

theory, and thus cannot stave off summary judgment as to that limited issue.  Tropigas de P.R., 637

F.3d at 56.

>    5.    *Treating Explosive Kids*, Whether or Not it is Derivative, is a Joint Work[11]
>
>         a.    *On This Record, the Court Cannot Resolve Whether Treating Explosive Kids is Derivative of The Explosive Child*

In response to Ablon's claims about his own contributions to Treating Explosive Kids,

Greene argues that Treating Explosive Kids is a derivative work based on The Explosive Child and

that the two intended that the content of the latter would be incorporated into the former but "would

remain Greene's exclusive intellectual property."  Greene Brief, D. 103 at 15-16.  As defined by the

Copyright Act, a "derivative work" is "a work based upon one or more preexisting works, such as

a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound

recording, art reproduction, abridgment, condensation, or any other form in which a work may be

---

(discussing Greene and Ablon's joint formation of the CPS Center); Ablon Aff., D. 78 at ¶¶ 9 (discussing Greene leasing office space to Ablon for Ablon's private practice), 18 (discussing Greene and Ablon's joint formation of the CPS Clinic and the CPS Center), 19 (discussing Greene and Ablon's mutual use of the CPS Center to develop and disseminate the CPS Approach), 20 (discussing Greene and Ablon's joint teaching activities on behalf of the Center and the Institute).

[11] Greene's brief could be read to imply that a given work may be a joint work or a derivative work, but not both.  Greene Brief, D. 103 at 8 (asserting that "[u]nder copyright law, two authors can create three different types of works: joint works, derivative works, and compilations"), 9 (stating that Treating Explosive Kids "would not be a joint work.  Instead, it would be a derivative work of The Explosive Child") (emphasis in original) (internal citations omitted).  Such an implication would be mistaken.  See 1 Nimmer, supra, § 6.05, at p. 6-14 (stating that "a given product may constitute . . . both a joint work and a derivative work") (emphasis in original).

recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101. "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). As Professor Nimmer notes:

> the term ["]derivative work["] in a technical sense does not refer to all works that borrow in any degree from pre-existing works. A work is not derivative unless it has <u>substantially</u> copied from a prior work. If what is borrowed consists merely of ideas and not the expression of ideas, then, although the work may have in part been derived [in a colloquial sense] from other works, it is not a derivative work.

> 1 Nimmer, supra, § 3.01, p. 3-3 (footnotes omitted) (emphasis in original).

Here, the record before the court is sufficiently open-ended to permit a rational factfinder to conclude either that <u>Treating Explosive Kids</u> is a derivative work based on <u>The Explosive Child</u> or that <u>Treating Explosive Kids</u> is not a derivative work.

On the one hand, the Certification of Copyright Registration for Treating Explosive Kids indicates that the book is not a derivative work. Certification, D. 84-3 at 4. Section 6(a) of the Certification, titled "DERIVATIVE WORK OR COMPILATION," includes a space titled "Preexisting Material," where a copyright applicant is instructed to "[i]dentify any preexisting work or works that this work is based on or incorporates," Certification, D. 84-3 at 4 § 6(a), and a space titled "Material Added to This Work," where a copyright applicant is instructed to "[g]ive a brief, general statement of the material that has been added to this work and in which copyright is claimed." Id. at 4 § 6(b). Both spaces were left blank on <u>Treating Explosive Kids</u>' Copyright Certification. Id. at 4 §§ 6(a)-(b). Additionally, the 2002 prospectus that led to the creation of

Treating Explosive Kids indicates that the proposed book "is intended to provide mental health clinicians with an intensive, in-depth orientation to CPS," which the prospectus describes as "a model of psychosocial treatment for [oppositional-defiant] children and their families, first articulated by Ross W. Greene, Ph.D., in his highly acclaimed book The Explosive Child," Prospectus, D. 78-13 at 2,  but does not indicate that the proposed book would in any way incorporate text from The Explosive Child.  Prospectus, D. 78-13 at 2-3.  That is, the prospectus makes clear that the proposed work would borrow ideas, rather than the expression of ideas, from The Explosive Child.  The contract Greene and Ablon signed with Guilford to publish Treating Explosive Kids appears to make no mention of The Explosive Child.  Contract, D. 78-14 at 2-11.

On the other hand, as Greene argues, "[e]ven a cursory comparison of Treating [Explosive Kids] with the 2005 edition of The Explosive Child reveals concepts, descriptions, organization of elements, and analysis in Treating [Explosive Kids] . . . make it clear that Treating [Explosive Kids] is in fact, as Greene contends, a derivative work of The Explosive Child."  Greene Brief, D. 103 at 16 n.23.  The Court has conducted such a cursory comparison – both Treating Explosive Kids and the 2005 edition of The Explosive Child have been filed with the Court, see The Explosive Child, 2005 edition, filed seriatim at D. 60, 60-1 and 60-2; Treating Explosive Kids, 2006 edition, filed seriatim at D. 78-1, 78-2 and 78-3 – and while the Court is unprepared to resolve this issue at this point to adopt Greene's conclusion as its own, there are sufficient similarities between the two works. Further, although the parties' subjective intent regarding a work's derivative status is not determinative of such status, see 17 U.S.C. § 101; 1 Nimmer, supra, § 3.01, p. 3-3,[12] Greene avers

---

[12] Greene asserts that the intent of a party or parties at the time of authorship "is controlling" as to whether a work is derivative and relies upon Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir. 1989) for this assertion.  However, Weissmann's discussion of intent deals with the parties'

that at the time he developed the prospectus for <u>Treating Explosive Kids</u> "[t]he book was to be based on the concepts expressed in <u>The Explosive Child</u> and would include portions of that text," that he and Ablon agreed at that the new book would be "derived from [Greene's] earlier works" and would "contain material derived and copied from [Greene's] prior works," and that Guilford knew <u>Treating Explosive Kids</u> was intended to be a derivative work and that Guilford erred by failing to register the book's copyright accordingly, Greene Aff., D. 58-1 at ¶¶ 19-20, 25, and these assertions, if credited by a factfinder, could reinforce the conclusion that <u>Treating Explosive Kids</u> is derivative of <u>The Explosive Child</u>.  For these reasons, the Court declines to resolve this matter at this juncture.

   *b.*  *<u>Treating Explosive Kids</u> is a Joint Work*

  The same is not true for the issue of whether <u>Treating Explosive Kids</u> is a joint work.  As defined in the Copyright Act, "[a] 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  "The essence of joint authorship is a joint laboring in furtherance of a preconcerted common design."  1 Nimmer, <u>supra</u>, at § 6.03, pp. 6-5, 6-6.  "The preconcerted common design, or, in the words of the Copyright Act, 'the intention that their contributions be merged,' must exist at the moment in time when the work was created, not at some later date." <u>Id.</u> at § 6.03, p. 6-6.  "It is not necessary that the respective contributions of several authors to a single work be equal, either quantitatively or qualitatively, in order to constitute them as joint authors."

---

intent to create a joint derivative work as opposed to separate derivative works by separate authors, not with parties' intent to create a derivative work as opposed to a wholly independent work. <u>Id.</u> at 1319 (stating, in a section titled "Intent to Contribute to Derivative Work," that "[i]n order for a work to be deemed a joint work, the parties must evince the <u>intention</u> that their contributions be merged at the time the writing is done, not at some later date") (internal quotation marks and citations omitted; emphasis in original).

Id. at § 6.07[A][1], p. 6-20.  To earn joint author status, a purported author's contribution must be "more than *de minimis*" - that is to say, "a person must add more than a word or a line to qualify as a joint author."  Id. at § 6.07[A][1], p. 6-20 n.1, n.2, n.2.1, n.3 (collecting cases).[13]

Greene and Ablon dispute the extent of Ablon's contribution to Treating Explosive Kids, with Greene asserting that Ablon contributed less than fifteen of the book's 226 pages of text, Am. Ver. Compl., D. 7 at ¶ 33; Greene Aff., D. 58-1 at ¶ 27, and Ablon asserting that his contributions appear on roughly 145 pages of the book, Ablon Aff., D. 78 at ¶ 34.[14]  Greene argues that this factual dispute precludes summary judgment.  Greene Brief, D. 103 at 6-7.  His argument is unavailing. The factual dispute regarding the extent of Ablon's contribution is immaterial; even if Greene's

---

[13] An additional requirement that the joint author's contribution be not only more than *de minimis* but also be a contribution that could independently merit copyright protection, see 1 Paul Goldstein, Copyright: Principles, Law & Practice § 4.2.1.2, at 379 (1989) (stating that "[a] collaborative contribution will not produce a joint work, and a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright"), has been adopted by some circuits.  See, e.g., Janky v. Lake County Convention & Visitors Bureau, 576 F.3d 356, 362 (7th Cir. 2009); Balkin v. Wilson, 863 F. Supp. 523, 527 (W.D. Mich. 1994).  The First Circuit has not addressed whether the law of this circuit requires only the *de minimis* showing discussed by Professor Nimmer or the additional qualitative requirement discussed by Professor Goldstein.  In any event, Professor Goldstein's additional "copyrightable subject matter" requirement would not affect the outcome in this case; although the parties dispute the size of Ablon's contributions to Treating Explosive Kids, they do not dispute that the contributions are sufficiently original to be copyrightable in their own right.  See, e.g., Greene Aff., 58-1 at ¶ 24 (conceding that Ablon "would contribute as original material some treatment vignettes describing some treatment interactions he had encountered" and that "vignettes of this type would not be derived from any of my preexisting works").

[14] The Court notes that in the Certification of Copyright Registration for Treating Explosive Kids, submitted to the Court by Greene, D. 84-3, section 2(b) identifies Ablon as an author of Treating Explosive Kids and, under pre-printed text stating "NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed," notes "Entire Text."  D. 84-3 at 2 § 2(b).  In identical fashion, section 2(a) of the same Certification identifies Greene as an author of the "Entire Text" of Treating Explosive Kids.  D. 84-3 at 2 § 2(a).

more parsimonious accounting of Ablon's contribution is correct, a fifteen-page contribution to a book the size of Treating Explosive Kids size is well above the "more than a word or a line" guideline for determining whether a contribution is *de minimis*, 1 Nimmer, supra, at § 6.07[A][1], p. 6-20, and Greene offers no legal authorities to the contrary.  Greene Brief, D. 103 at 6-7.

Greene also argues that a dispute exists as to whether, at the time Treating Explosive Kids was created, Greene and Ablon intended the book to be a joint work.  Greene Brief, D. 103 at 8-9. The key legal question is not whether the parties intended Treating Explosive Kids to be a joint work in any colloquial sense, but rather whether they intended their individual contributions to be "merged into inseparable or interdependent parts of a unitary whole" rather than into separable and distinct works.  17 U.S.C. § 101.[15]  Here, while Greene's affidavit may suggest at points that he was frustrated with the quantity and quality of Ablon's early contributions to the book and thus believed that the authorship process was not a truly joint enterprise, Greene Aff., D. 58-1 at ¶ 24 (stating "I was compelled to discard most of Dr. Ablon's draft work and thereafter to write the book myself"); ¶ 28 (stating that "[t]he work that was actually published was authored solely and exclusively by me, with, at best, a *de minimis* 'contribution' by Dr. Ablon"), there is no evidence that either Greene or Ablon believed that Treating Explosive Kids was anything other than a unitary book, see, e.g., Certification, D. 84-3 at 3-4 (referring to Treating Explosive Kids as a single work); Contract D. 78-

---

[15] Greene's brief is somewhat imprecise with regard to the distinction between the legal definition of "joint work" and any colloquial meanings that may attach to the term.  Specifically, the brief states that "[i]n order to create a joint work for copyright purposes, both authors must have intended at the time the book was written that the work would be a co-authored joint work," Greene Brief, D. 103 at 8, and cites Weissmann, 868 F.2d at 1318, as the sole support for this proposition.  Although Weissmann did indeed state that to establish a work's joint status, "each [author] must intend to contribute to a joint work at the time his or her alleged contribution is made," id., but it made this statement only after noting the precise legal definition of "joint work" as set forth in 17 U.S.C. § 101.  Id. at 1317-18 (quoting 17 U.S.C. § 101).

14 at 2-8 (same), and there is abundant evidence that Ablon's contributions to the book would be interdependent with Greene's contributions. See, e.g., Greene Aff., D. 58-1 at ¶ 25 (indicating that Greene "oversaw all editorial revisions for this book . . . and was solely responsible for revisions," including revisions to Ablon's contributions); Am. Ver. Compl., D. 7 at ¶ 32 (stating that after Ablon submitted his contributions, Greene "oversaw all editorial revisions and was solely responsible for revisions to the book"); Ablon Aff., D. 78 at ¶ 34 (stating that Ablon not only wrote "significant parts" of the book but also "reviewed and made suggestions for many [Greene-authored] sections of the book), ¶ 35 (stating that "[w]hile [Greene] may have taken the lead with the agent and the publisher, and he edited drafts, my work was very important to the book . . . . [and] is integrated within the book as an integral part of the book"). Accordingly, there is no genuine dispute of material fact with regard to the parties' intent at the time Treating Explosive Kids was created to merge each party's contribution into a unitary whole.

Additionally, Ablon argues that Greene has effectively admitted in his verified pleadings that Treating Explosive Kids is a joint work. Ablon Brief, D. 93 at 12-15. Ablon points specifically to a number of statements in Greene's Amended Verified Complaint, including Greene's assertion in Count II that he "holds a valid and registered undivided interest in the copyright for Treating Explosive Kids, along with Dr. Ablon," Am. Ver. Compl. ¶ 88, Greene's description in Count II of the rights to Treating Explosive Kids as a "joint copyright held by [Ablon] and Dr. Greene," id. at ¶ 90, Greene's assertion in Count III that "[a]s co-owner of the copyright for Treating Explosive Kids, Dr. Greene is entitled, as a matter of law, to a full and complete accounting" of revenue associated with Ablon's use of that copyright as well as "to his ratable share of all revenue generated," id. at ¶¶ 93-94, and Greene's assertion in Count XII that Treating Explosive Kids is a

"work that is co-owned" by Greene and Ablon, id. at ¶ 148(a).  Greene asserts that these statements

are all drawn from counts pled in the alternative and thus should not be considered admissions.

Greene Brief, D. 103 at 12-13.  Ablon argues that the counts in question are not pled in the

alternative.  Ablon Reply, D. 148 at 3-4.  The Court agrees with Ablon on this point.  The Amended

Verified Complaint sets forth three counts under the Copyright Act against Ablon: Count I, alleging

copyright infringement related solely to The Explosive Child, Am. Ver. Compl. D. 7 at ¶¶ 80-86,

and Counts II and III, alleging "copyright infringement/co-authorship" and "accounting/co-owned

copyright" solely with regard to Treating Explosive Kids, id. at ¶¶ 87-97.  The latter two counts in

no way depend upon the first count; a finding of copyright infringement (or lack thereof) with regard

to The Explosive Child would not impact any finding regarding the copyright to Treating Explosive

Kids, and vice-versa.  Nor do counts II and III state on their face that they are pled in the alternative;

to the contrary, each count "incorporates by reference and realleges the allegations contained in

[Count I and the complaint as a whole] as if specifically set forth herein."  Am. Ver. Compl., D. 7

at ¶¶ 87, 91.  Similarly, Count XII, which seeks declaratory relief, specifically asserts that Ablon has

"infringed Dr. Greene's copyrights by, among other things, failing to account for royalties and other

profits from the sale and distribution of work that is co-owned by Dr. Greene and by using, without

permission or authorization, works copywritten exclusively in the name of Dr. Greene."  Id. at ¶

148(a) (emphasis added).  This is clearly an additional and cumulative pleading, not a pleading in

the alternative.  However, because the Court has found that the evidence in the record is otherwise

sufficient to establish Ablon's entitlement to a ruling on summary judgment that Treating Explosive

Kids is a joint work, the Court need not determine whether Greene's verified pleadings alone could

provide a sole, independent basis for foreclosing Greene's argument that <u>Treating Explosive Kids</u> is not a joint work.

For these reasons, Ablon's motion for partial summary judgment is GRANTED to the extent it sought rulings that: 1) the CPS Approach, as a concept, is not copyright protectable; 2) Greene's copyright infringement claims must be based on expressions in <u>The Explosive Child</u>, not on expressions found solely in related slide show presentations; 3) Ablon cannot be held liable for "conspiring" with MGH; and 4) <u>Treating Explosive Kids</u> is a joint work.

## B.  <u>MGH's Motion for Partial Summary Judgment</u>

MGH's motion for partial summary judgment, D. 94, asserts that Greene's various employment agreements with MGH establish as a matter of law that MGH owns the service marks "Collaborative Problem Solving" and "Collaborative Problem Solving Approach" (collectively "CPS Marks") and the service marks "Think:Kids" and "Think:Kids: Rethinking Challenging Kids" (collectively "Think:Kids Marks").  MGH Brief, D. 96 at 2.  Additionally, both Greene and MGH have filed Motions to Strike, D. 109, D. 129, which seek to strike some of the record materials underlying MGH's motion for partial summary judgment.  The Court will address the Motions to Strike before turning to MGH's motion for partial summary judgment.

### 1.    <u>Motions to Strike</u>

As an initial matter, the Court addresses MGH's April 10, 2012 Motion to Strike, D. 109, and Greene's June 12, 2012 Motion to Strike, D. 129.

MGH's motion seeks to strike various portions of Greene's March 30, 2012 affidavit, D. 107, on the grounds that the contested statements are "irrelevant," "ambiguous," "conclusory," and on occasion "purport[] to describe the subjective state of mind of other parties," and thus would be

inadmissable at trial.  MGH Mem., D. 110 at 1-2.  Many of MGH's objections were resolved by the Court's June 7, 2012 order precluding Greene's reliance at the summary judgment stage on an alleged oral licensing agreement between Greene and MGH.  D. 120; MGH Reply, D. 132-1 at 2-4. The upshot of the remainder of MGH's objections are that Greene may not rely upon his own subjective beliefs, never communicated to MGH, to contend that he had no meeting of the minds with MGH about his employment contracts and, to the extent that he claims that such contracts are voidable as the result of unilateral mistake, he has waived that affirmative defense.  MGH Brief, D. 110 at 11-12; MGH Reply, D. 132-1 at 3-5.  The Court agrees with MGH's legal analysis. Accordingly, the Court has not relied upon these portions of the affidavit in resolving MGH's motion for summary judgment and the motion to strike, D. 109,  is ALLOWED.

Greene seeks to strike certain portions of the February 8, 2012 King affidavit, D. 98, alleging that King's affidavit unnecessarily and incorrectly characterizes MGH-study-related documents that speak for themselves and inappropriately includes legal conclusions regarding the CPS Institute. Greene Mot., D. 129 at 1-3.  As MGH points out, the characterizations in the King affidavit to which Greene objects were drawn directly from Greene's own curriculum vitae, which characterized the studies at issue, MGH Opp., D. 131 at 3; Greene C.V. Excerpt, D. 131-1 at 2, and many of the statements regarding the CPS Institute that Greene now seeks stricken from the King affidavit were admitted as facts by Greene in his response to MGH's proposed statement of undisputed facts. MGH Opp., D. 131 at 5-7 (collecting record citations).   Accordingly, Greene's motion to strike, D. 129, is DENIED.

2.      Greene is Subject to the MGH Intellectual Property Policies In Effect During His Employment

A formal notice of appointment to a university-related position is "the equivalent of an employment contract." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 566 n. 1 (1972).  Under Massachusetts law, such contracts or contract equivalents can import by reference university policies into the employment agreement.  Madonna v. Trustees of Univ. of Mass., 32 Mass. App. Ct. 693, 694 (1992).[16]  Indeed, one Massachusetts court has specifically held that an application for staff privileges at MGH may be treated as an employment contract and may import by reference MGH's intellectual property policies.  Grocela et al. v. The Gen. Hosp. Corp (d/b/a Mass. Gen. Hosp.) et al., No. 11-991-BLS1, at 7-8 (Suffolk Sup. Ct. July 12, 2012) (citing Madonna and holding that "the express language of [an] application for staff privileges imported [MGH's] IP Policy"[17] and "[u]nder the plain language of [the] application, [the applicant] agreed that the disposition of inventions and other intellectual property that he created during his appointment was to be determined by the provisions of the IP Policy").[18]

Here, Greene applied and reapplied for staff positions at MGH staff positions ten separate times between April 19, 1993 and October 1, 2007, and each time his application explicitly stated that he agreed to abide by the bylaws, rules, regulations and policies applicable to MGH's

---

[16] The specific importing language at issue in Madonna was "[a]ll employees of the University are employed pursuant to and subject to the policies and procedures of the [University] Medical Center and the policies, rules and regulations adopted by the Board of Trustees of the University as amended, revised, or repealed from time to time."  Madonna, 32 Mass. App. Ct. at 694.

[17] The "express language" at issue was "I understand that the ownership and dispensation of inventions and other intellectual property that I create during the time when I have my Professional Staff appointment shall be determined in accordance with the Intellectual Property Policy of the hospital, a copy of which is available [online]."  Grocela, No. 11-991-BLS1, at 2.

[18] A copy of unpublished Grocela decision has been filed with the Court at D. 151-1.

professional staff.  Weinstein Aff., D. 102 at ¶¶ 5, 8, 11, 14, 17, 22, 25, 28, 31, 34.[19]  Each of

Greene's ten applications were accepted subject to the explicit condition that Greene "[a]bide by the

Bylaws, rules, regulations, and policies of the Professional Staff and Hospital."  Id. at ¶¶ 10, 13, 16,

18, 21, 24, 27, 30, 33, 36.  This language, like the language at issue in Madonna, 32 Mass. App. Ct.

at 694, is sufficient to import MGH's professional staff policies into Greene's employment

agreement.  Two particular MGH policies are relevant here.  First is the 1995 IP Policy, which was

adopted on April 21, 1995.  Clark Aff., D. 97 at ¶ 5.  Five of Greene's applications were submitted

and accepted when the 1995 IP Policy was in effect; the first of these five was submitted on October

1, 1996 and accepted on February 24, 1997 securing Greene an appointment at MGH beginning on

January 1, 1997.  Weinstein Aff., D. 102 at ¶¶ 14-27.  Second is the 2002 IP Policy, which

supplanted the 1995 IP Policy and was adopted on July 19, 2002.  Clark Aff., D. 97 at ¶ 12.  Three

of Greene's applications were submitted and accepted when the 2002 IP Policy was in effect; the

first of these three was submitted on October 2, 2003 and accepted on December 22, 2003 securing

Greene an appointment beginning on November 5, 2003.  Weinstein Aff., D. 102 at ¶¶ 28-36.

Accordingly, Greene was subject to the 1995 IP Policy from, at the very latest, February 24, 1997

and subject to the 2002 IP Policy from, at the very latest, November 5, 2003.

     Greene argues that he is not subject to the 1995 and 2002 IP Policies because they did not

exist when Greene first agreed to work at MGH.  Greene Brief, D. 106 at 2-5.  The fact that

Greene's employment preceded the adoption of the 1995 IP Policy, however, does not alter the fact

---

[19] On two of these ten applications, Greene specifically agreed to read the bylaws and policies
incorporated by reference, Weinstein Aff., D. 103 at ¶¶ 14, 17, and on five other applications
Greene stated that he had an opportunity to read the relevant bylaws and policies.  Id. at ¶¶ 22,
25, 28, 31, 34.

that Greene offered to abide by MGH's policies when he submitted his appointment application on

October 1, 1996, nor the fact that MGH accepted that offer on February 24, 1997, nor the fact that

the 1995 IP Policy was in effect at both those times.  Greene's related assertion that he did not know

(and that MGH did not tell him) that the 1995 and 2002 IP Policies had been enacted, Greene Brief,

D. 106 at 4, is unavailing for two reasons.  First, in two of the appointment applications Greene

submitted after the 1995 IP Policy was adopted, Greene specifically agreed to read the MGH

policies.  Weinstein Aff., D. 103 at ¶¶ 14, 17.  Second, even if Greene had not specifically promised

to read the policies, the policies were nonetheless incorporated by reference into eight of Greene's

various employment agreements, and "a party to a contract is assumed to have read and understood

the terms of a contract []he signs."  Rosenberg v. Merrill Lynch, 170 F.3d 1, 21 n.17 (1st Cir. 1999)

(citation omitted) (noting also that "[i]f [defendant employer] had provided the rules to [plaintiff

employee] but she did not read them, that would not save her").[20]

Before applying the 1995 and 2002 IP Policies to the marks at issue, the Court will briefly

discuss the relevant content of the two policies.  Under the 1995 IP Policy, "[t]rademarks shall be

owned by MGH if they are created by Members in the course of their employment or affiliation with

an Institution[21] or if they are used to identify any product or service originating with or associated

---

[20] Greene also raises various arguments asserting that he is not subject to the 1995 and 2002 IP
Policies based wholly or in part on a purported oral agreement between Greene and MGH.
Greene Brief, D. 106 at 5-10.  These arguments are foreclosed by the Court's June 7, 2012 Order
precluding Greene's reliance on the purported oral agreement.  D. 120.

[21] The 1995 IP Policy defines "Institution" as any of a number of organizations affiliated with
MGH (specifically, "The General Hospital Corporation, The McLean Hospital Corporation, The
Spaulding Rehabilitation Hospital Corporation, the MGH Health Services Corporation, MGH
Home Health Services, Massachusetts General Physicians Organization, Inc., The MGH Institute
of Health Professionals, Inc., and any other corporation created by The Massachusetts General
Hospital and designated . . . as subject to this Policy"), and defines "Member" as "each member

with an Institution," 1995 IP Policy § 14.0, D. 97-6 at 10, and "[a]ny Intellectual Property not specifically covered by the foregoing sections of this Policy shall be owned by an Institution if it is created in the performance of Sponsored or Supported Activity at that Institution." 1995 IP Policy § 16.0, D. 97-6 at 10. The policy defines "Sponsored Activity" as "any activity that is subject to a grant, contract or other arrangement between an Institution and a third party" and "Supported Activity" as "activity that either receives direct or indirect financial support from an Institution, including funding from any outside source awarded to or administered by the Institution." 1995 IP Policy Glossary, D. 97-6 at 15.

The 2002 IP Policy is similar, but not identical. Under the 2002 IP Policy, "[t]rademarks shall be owned by an Institution if they are created by Members in the course of their employment or affiliation with an Institution,[22] if they are used to identify any product or service originating with or associated with an Institution, or pertain to significant Institutional Activities." 2012 IP Policy § 14.0, D. 97-7 at 13. The policy defines "Institutional Activities" as "any activities that received direct or indirect financial support from an Institution, including Institutional salary support or funding from any outside source awarded to or administered by the Institution . . . or were otherwise subject to any grant, contract or other arrangement between the Institution and a third party . . . ."

---

of the Professional Staff of an Institution." 1995 IP Policy Glossary, D. 97-6 at 14.

[22] The 2012 IP Policy defines "Institution" as any of a list of organizations affiliated with MGH (specifically, "The Brigham and Women's Hospital, Inc., The Brigham and Women's Physicians Organization, Inc., The Massachusetts General Hospital, The General Hospital Corporation, The McLean Hospital Corporation, Massachusetts General Physicians Organization, Inc., The MGH Institute of Health Professionals, Inc., [and] The Spaulding Rehabilitation Hospital Corporation"), and defines "Member" as "each member of the Medical Professional Staff (including individuals holding appointments as Visiting Staff) of MGH, BWH, Spaulding, or a Hospital affiliated with any of them . . . ." 2002 IP Policy Glossary, D. 97-7 at 19-20.

2002 IP Policy Glossary, D. 97-7 at 20.  This definition is essentially a conflation of the terms "Sponsored Activity" and "Supported Activity" in the 1995 IP Policy.

        3.      <u>Under the 1995 and 2002 IP Policies, MGH Owns the CPS Marks</u>

MGH argues that two separate prongs of these policies[23] establish MGH's ownership of the CPS Marks[24]: first, the CPS Marks were used to identify services associated with MGH, <u>see</u> 1995 IP Policy § 14.0, D. 97-6 at 10; 2012 IP Policy § 14.0, D. 97-7 at 13, and second, the CPS Marks pertain to (and/or were created during) the performance of significant activities that received financial support from MGH and funding from outside sources that was subsequently administered by MGH, which would be "Supported Activities" under the terms of the 1995 IP Policy, <u>see</u> 1995 IP Policy Glossary, D. 97-6 at 15, and would be "Institutional Activities" under the terms of the 2002 IP Policy, <u>see</u> 2002 IP Policy Glossary, D. 97-7 at 20.  Under either of these two prongs, MGH is entitled to summary judgment regarding ownership of the CPS Marks.

        a.      *The CPS Marks Were Used to Identify Services Associated With MGH*

First, the CPS Marks were clearly used to identify services associated with MGH.  The MGH program jointly administered by Greene and Ablon was called the Collaborative Problem Solving Institute from its founding in 2002 until its rebranding in 2007.  Ablon Aff., D. 78 at ¶ 6.  While Greene was serving as the Institute's director, he repeatedly sent e-mails, faxes, and flyers indicating

---

[23] The record suggests (but does not make entirely explicit) that at least some of the events surrounding the CPS Marks occurred before the 1995 IP Policy was superseded by the 2002 IP Policy and some events appear to have occurred afterwards.  In an abundance of caution, the Court will examine the CPS Marks in light of both policies.

[24] Again, the CPS Marks are the phrases "Collaborative Problem Solving" and "The Collaborative Problem Solving Approach."  King Aff., D. 98 at ¶¶ 36, 38.

that both he and the Institute were associated with MGH.  King Aff., D. 98 at ¶¶ 4, 13, 26.  The

Institute maintained a website, nested within MGH's website, that specifically stated that the

"Institute was founded . . . to assist parents, educators, and mental health and medical professionals

in understanding and implementing the Collaborative Problem Solving approach," and, on a subpage

titled "The Approach," that "[s]taff from the CPS Institute train more than 20,000 parents, educators,

and mental health and [sic] professionals in the Collaborative Problem Solving approach a year."

King Aff., D. 98 at ¶ 42; CPS Institute Website, D. 98-11 at 2-3.  CPS Institute fundraising

brochures, marked with the MGH logo, discussed "the Collaborative Problem Solving (CPS)

approach" and "[t]he CPS model" at length, and repeated the statement that the Institute was

founded to assist with "understanding and implementing the Collaborative Problem Solving

approach."  Brochure, D. 101-6 at 2-3, 6.  According to a winter 2007 newsletter distributed by the

CPS Institute's successor, Think:Kids, and marked with the MGH logo, Think:Kids staff "conducted

numerous studies on the effectiveness of Collaborative Problem Solving (CPS)" and oversaw the

implementation of the CPS model at various locations in Maine and Massachusetts.  Newsletter, D.

98-1 at 10-11.  The newsletter also indicated that readers could "[l]earn more about the

Collaborative Problem Solving approach in the fall addition [sic] of Proto magazine . . . a

publication from Massachusetts General Hospital featuring cutting edge developments in

healthcare."  Newsletter, D. 98-1 at 13.

Taken together, the record overwhelmingly shows that the phrases Collaborative Problem

Solving and the Collaborative Problem Solving Approach were repeatedly used to identify the

services provided by MGH's Collaborative Problem Solving Institute, and thus by the terms of

Greene's various employment contracts and the 1995 IP Policy and the 2002 IP Policy imported

therein, any ownership interest Greene might otherwise have in the CPS marks belongs to MGH,

not Greene.[25]

       b.    *The CPS Marks Pertain To Significant Activities that Received both Financial Support from MGH and Outside Funding Administered by MGH*

Second, the CPS Marks pertain to significant activities that clearly received both financial

support from MGH and received outside funding that was subsequently administered by MGH.  The

MGH Department of Psychiatry loaned over $55,000 to Greene to assist in the build-out and

furnishing of the CPS Institute offices.  Rosenbaum Aff., D. 100 at ¶ 10.  The MGH Development

Office assisted the CPS Institute not only with fundraising efforts, see, e.g., Brochure, D. 101-6,[26]

but also with "receipt and processing of charitable donations to the CPS Institute," Taylor Aff., D.

101 at ¶ 2, including establishing a "sundry fund" internal to MGH to hold the Institute's funds.

Taylor Aff., D. 101 at ¶ 11.  From the time the Institute's sundry fund was created in 2003 until

December 2008, the Institute's sundry fund received – and MGH administered – a significant

amount of money; specifically, $961,184.37 in gifts and $632,000 in paid pledges, resulting in a

total of $1,593,184.37 administered by MGH for the Institute.  Taylor Aff., D. 101 at ¶ 11.  Given

---

[25] Greene argues that the term "associated with an institution" as used in the 1995 and 2002 IP Policies, see 1995 IP Policy § 14.0, D. 97-6 at 10; 2012 IP Policy § 14.0, D. 97-7 at 13, is ambiguous, and he asserts both that "at the time Greene created the CPS Marks, it was MGH that was associated with his services, not the reverse," and that by that point "MGH had acknowledged that [Greene] owned the marks, and MGH used the marks only with Greene's permission under an agreement that the marks would remain Greene's property."  Greene Brief, D. 106 at 11-14.  The agreement to which Greene refers is the purported oral agreement upon which Greene may not rely.  D. 120.

[26] For example, the Brochure states that the CPS Institute and its staff "welcome and appreciate gifts of any size.  Please contact the Massachusetts General Hospital Development Office for more information, or mail your check, made payable to the Massachusetts General Hospital, to [the MGH Development Office's address]."  Brochure, D. 101-6 at 4.

the close relationship between the CPS Marks and the CPS Institute as discussed above, the record is clear that the CPS Marks pertain to significant activities that received financial support and financial administrative support from MGH, and thus by the terms of Greene's various employment contracts and the 1995 and 2002 IP Policies imported therein, any ownership interest Greene might otherwise have in the CPS marks belongs to MGH, not Greene.

Greene argues that the CPS Institute's activities were not "significant," especially since that term is not defined in the 1995 and 2002 IP Policies and any ambiguities in MGH's policies must be construed against MGH.  Greene Brief, D. 106 at 12-13 (citing Merrimac Valley Nat'l Bank v. Baird, 372 Mass. 721, 723-24 (1997) (stating that "[a]s a general rule, a writing is construed against the author of the doubtful language").  Here, in light of the amount of financial assistance provided directly or indirectly from MGH to the CPS Institute, and given the absence of any evidence in the record suggesting that this assistance was a small percentage of the CPS Institute's work, the Court agrees with MGH that "whatever the boundary between 'significant' and 'insignificant' may be, there is no need to" precisely resolve the location of the boundary "given the undisputed facts of this case."  MGH Reply, D. 136 at 13.

4.  Under the 2002 IP Policy, MGH Owns the Think:Kids Marks

The CPS Center registered the Think:Kids Marks[27] on the USPTO principal register.  King Aff., D. 98 at ¶¶ 40-41.  This creates a rebuttable presumption that the Think:Kids Marks are valid and that CPS Center owns the Think:Kids Marks and has the exclusive right to their use.  15 U.S.C. § 1057(b); see Cold War Museum, Inc. v. Cold War Air Museum, Inc., 586 F.3d 1352, 1356 (Fed.

---

[27]  Again, the Think:Kids Marks are "Think:Kids" and "Think:Kids: Rethinking Challenging Kids."   King Aff., D. 98 at ¶¶ 40-41.

Cir. 2009) (holding that registration per 15 U.S.C. § 1057(b) creates a rebuttable presumption of

validity, rebuttal of which requires a preponderance of the evidence showing).   Nonetheless, MGH

argues that three prongs of the 2002 IP Policy[28] establish that MGH, and not the CPS Center, owns

the Think:Kids Marks:  first, the Think:Kids Marks were created in the course of Greene and

Ablon's affiliation with MGH, not as part of their affiliation with the CPS Center, see 2002 IP Policy

§ 14.0, D. 97-7 at 13; second, the Think:Kids Marks were used to identify services associated with

MGH, see 2012 IP Policy § 14.0, D. 97-7 at 13, and third, the Think:Kids Marks pertain to

significant institutional activities under the terms of the 2002 IP Policy, see 2002 IP Policy Glossary,

D. 97-7 at 20.  The Court agrees with MGH's position on each of these points.

a.      *The Think:Kids Marks Were Developed by Greene and Ablon in Connection With Their MGH Responsibilities*

Greene specifically alleges that "[t]he idea for a "Think:Kids" brand was conceived by Drs.

Greene and Ablon in connection with the business purposes of [the CPS Center]," that Greene and

Ablon "agreed that the trademarks 'Think:Kids' and 'Think:Kids: Rethinking Challenging Kids'

should and would be registered as trademarks belong to [the CPS Center]," and that "MGH and the

Institute were permitted to use the marks so long as their activities were consistent with [the CPS

Center]'s objectives and as long as they had [the CPS Center]'s permission to use the Marks."  Am.

Ver. Compl., D. 7 at ¶ 47.[29]  But no reasonable factfinder could credit this allegation in light of

---

[28] "Think:Kids" and similar phrases were developed in 2006 or 2007.  Am. Ver. Compl., D. 7 at ¶ 47; Ablon Aff., D. 78 at ¶ 6.  There is no dispute that by this time the 2002 IP Policy was in effect and the 1995 IP Policy had been superseded.  Accordingly, the Court will examine the Think:Kids Marks in light of the 2002 IP Policy.

[29] Ablon refutes this allegation, stating that "[i]n 2007, using marketing and other professionals paid for by [MGH], we rebranded the [MGH-affiliated CPS] Institute as Think:Kids."  Ablon Aff., D. 78 at ¶ 6.

36

contrary evidence in the record.  In a January 3, 2007 e-mail from Greene disclosed during discovery, Greene specifically stated that he and Ablon were "pulling together materials" to support a trademark application, and stated further that "[o]ur non-profit, the Collaborative Problem Solving Institute, is on the precipice of launching a major public awareness campaign under the brand 'Think:Kids," with the tagline of 'Rethinking challenging kids.'  Obviously, before we launch our campaign, we want to make sure we're in the clear with the brand and tagline."  Greene to Bagley e-mail, D. 98-1 at 14.  The CPS Institute is the MGH-affiliated non-profit and is distinct from the private, unaffiliated CPS Center.  Later that year, the newly-created Think:Kids website, emblazoned with an MGH logo, explicitly stated that "Think:Kids is an initiative of the nonprofit Collaborative Problem Solving Institute in the Department of Psychiatry at Massachusetts General Hospital, Boston, Massachusetts."  Website, D. 98-12 at 3.  When the CPS Center applied to register the Think:Kids and Think:Kids: Rethinking Challenging Kids trademarks, the specimens it submitted in support of its statement of use were printouts of this aforementioned Think:Kids website, complete with MGH logos and express admission that Think:Kids is an initiative of MGH's CPS Institute, and a successor to this website.  King Aff., D. 98 at ¶¶ 40(f), 41(b); Application Excerpts, D. 98-10 at 9-11, D. 98-9 at 12-17.  Further, in the winter of 2007, Think:Kids published a newsletter that stated "Think:Kids is an initiative of the CPS Institute, Department of Psychiatry." King Aff., D. 98 at ¶ 6.

In light of Greene's own e-mails and the content of the CPS Center's trademark applications, there is simply no genuine dispute–even granting full consideration to Greene's verified complaint and viewing the record in the light most favorable to Greene–as to the fact that the Think:Kids Marks were developed in association with MGH and the MGH-affiliated CPS Institute (prior to its

rebranding as "Think:Kids"), not in association with the separate CPS Center. This is sufficient to bring the Think:Kids Marks within the ambit of the 2002 IP Policy, which states that "[t]rademarks shall be owned by an Institution if they are created by Members in the course of their employment or affiliation with an Institution." 2002 IP Policy § 14.0, D. 97-7 at 13.

        b.      *The Think:Kids Marks Were Used to Identify Services Associated with MGH*

Like the CPS Marks, the Think:Kids Marks were used to identify services associated with MGH. For example, in March 2007, Greene submitted a grant application on behalf of MGH's CPS Institute in which he stated that "our Public Awareness Campaign, *Think:Kids – Rethinking Challenging Kids*, is disseminating on a large scale a more contemporary, more accurate understanding of the true difficulties of kids with social, emotional, and behavioral challenges," listed a variety of services provided by the Institute in support of this goal, including a "new, interactive website," and provided copies of MGH financial statements and a list of MGH Board of Trustees members. Grant Application, D. 99-8 at 6, 13-42, 44-48. The "new, interactive website" is the website discussed above that explicitly states that Think:Kids is "an initiative of the nonprofit Collaborative Problem Solving Institute in the Department of Psychiatry at Massachusetts General Hospital." Website, D. 98-12 at 3. Each page of the website also included the phrase "Think:Kids Rethinking Challenging Kids" as well as an MGH logo on two pages. Website, D. 98-12 at 1-11. This is independently sufficient to bring the Think:Kids Marks within the ambit of the 2002 IP Policy, which states that "[t]rademarks shall be owned by an Institution if . . . they are used to identify any product or service originating with or associated with an Institution." 2002 IP Policy § 14.0, D. 97-7 at 13.

c.      *The Think:Kids Marks Pertain To Significant Activities that Received Outside Funding Administered by MGH*

Finally, because the "sundry account" designed for the CPS Institute continued to be in use until December 2008, long after the CPS Institute had been rebranded as Think:Kids, the reasoning set forth above establishing that the CPS Marks pertain to significant activities that received outside funding administered by MGH applies equally to the Think:Kids Marks.   Accordingly, the Think:Kids Marks fall within the ambit of the 2002 IP Policy, which states that "[t]rademarks shall be owned by an Institution if they . . . pertain to significant Institutional Activities," 2002 IP Policy § 14.0, D. 97-7 at 13, defined as "any activities that received direct or indirect financial support from an Institution, including Institutional salary support or funding from any outside source awarded to or administered by the Institution . . . ." 2002 IP Policy Glossary, D. 97-7 at 20.

For all these reasons, MGH is entitled to summary judgment as to its claims that, by the terms of Greene's various employment contracts and the 1995 and 2002 IP Policies imported therein, any ownership interest Greene or the CPS Institute might otherwise have in the CPS Marks and the Think:Kids Marks belongs to MGH, not Greene or the CPS Center.[30]

5.      Greene's Preclusion Motion

Finally, Greene's preclusion motion, D. 74, is DENIED.  Greene takes issue with Ablon's late production of a 207-page draft manuscript titled "It Takes a School" and purportedly jointly authored by Greene and Ablon, which Greene describes as a "very early draft of a project on which I had originally considered including Dr. Ablon as a co-author," Greene Aff., D. 76 at ¶ 3, and which

---

[30] Because the Court is able to resolve MGH's partial summary judgment motion on the grounds stated above, it need not address MGH's further arguments regarding estoppel or whether the marks are not distinctive (and, thus, do not warrant trademark protection) or Greene's responses to these arguments.  MGH Brief, D. 96 at 14-19; Greene Brief, D. 106 at 17-20.

was, according to Ablon, subsequently published under the title "Lost At School" with Greene listed as the sole author.  Greene Opp., D. 81 at 2 n.1.  Although Greene claims prejudice from this late disclosure, he does not dispute that he did at one point possess a copy of the draft manuscript, Greene Aff., D. 76 at ¶ 4 (stating that he "did not retain this draft . . . once it was superseded by manuscripts authored solely by me" and that he does "not now have, nor did I have in my possession, custody or control since at least 2008, any copies or versions of the 207 page manuscript").  Given Greene's prior knowledge of the manuscript, the Court does not find sufficient prejudice to justify precluding Ablon's late production of the "It Takes a School" manuscript.

Greene also takes issue with Ablon's late production of a series of slides and flyers, many of which have both Greene's and Ablon's names on them.  Greene Brief, D. 81 at 6-13.  Ablon avers that he "ha[s] no doubt that Dr. Greene was aware of these slides well before they were produced in the course of this litigation," and asserts that "Dr. Greene would have the identical or similar version s of these slides in his own files," Ablon Aff., D. 82 at ¶ 9.  Indeed, Ablon faults Greene for "[o]ffering no clear explanation for why these documents were not timely produced *by him* during the course of discovery."  Ablon Opp., D. 81 at 1.  On this record, the Court finds no prejudice or unfair surprise to Greene, particularly given the current posture of the case, and, therefore, DENIES his motion, D. 74, to preclude Ablon and MGH from relying on these documents in this litigation.

## VI.    Conclusion

For the reasons set forth above, Ablon's motion for partial summary judgment, D. 90, is GRANTED in part and DENIED in part and MGH's motion for partial summary judgment, D. 94, is GRANTED.  Green's motions to strike or preclude, D. 74, D. 125 and 129, are DENIED.  Ablon's motion to strike, D. 137, is ALLOWED.  MGH's motion to strike, D. 109, is ALLOWED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge