## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**ROSS GREENE,**                        )
                                        )
   **Plaintiff,**        )
                                        )
   **v.**                )  **Civil Action No. 09-10937-DJC**
                                        )
**J. STUART ABLON and**                 )
**GENERAL HOSPITAL CORPORATION,**       )
**also known as**                       )
**MASSACHUSETTS GENERAL HOSPITAL,**     )
                                        )
   **Defendants.**        )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**           December 4, 2012

## I. Introduction

The factual and procedural background of this case was described at length in the Court's recent memorandum and order resolving the defendants' separate motions for partial summary judgment. Greene v. Ablon, No. 09-10937-DJC, 2012 WL 4104792 at *2-7 (D. Mass. Sept. 17, 2012) ("Greene I"). The task now before the Court is to identify the protected elements under copyright law in the book at issue in this litigation called The Explosive Child:  A New Approach for Understanding and Parenting Easily Frustrated "Chronically Inflexible" Children ("The Explosive Child"). Am. Ver. Compl., D. 7 ¶ 81. The Court now briefly relates only the factual background that is relevant for understanding the context of the copyright "dissection" analysis addressed in this Memorandum and Order.

In 1993, Plaintiff Dr. Ross Greene ("Greene") originated a treatment approach for resolving problems between children and their caregivers. Greene I, 2012 WL 4104792 at *2.

Since that time Greene has authored and co-authored books and materials describing, developing and supporting that treatment approach. <u>Id.</u> Over time, the treatment approach came to be known as the "Collaborative Problem Solving Approach" ("CPS Approach"). <u>Id.</u> Greene refined the approach with his former colleague Defendant Dr. J. Stuart Ablon ("Ablon") while Greene was employed by Defendant General Hospital Corporation d/b/a Massachusetts General Hospital ("MGH"). <u>Id.</u> at *2-6.

Greene's relationships with Ablon and MGH eventually deteriorated. <u>Id.</u> In 2009, Greene filed this lawsuit against Ablon and MGH asserting thirteen counts, including a claim that Ablon had infringed Greene's copyrights. Am. Ver. Compl., D. 7 ¶¶ 80-90. Specifically, in his amended verified complaint, Greene sought to protect the registered copyright that Greene owns in <u>The Explosive Child</u>, a book that Greene authored. D. 7 ¶ 81. Greene alleged that Ablon created materials, including presentation slides, that "substantially derived from <u>The Explosive Child</u> without permission [or] attribution" and in so doing, infringed Greene's copyright. D. 7 ¶ 83. Greene also alleged that Ablon violated Greene's "common law copyrights" in Greene's CPS Approach treatment materials, including "assessment materials and instruments." D. 7 ¶¶ 9-10, 82-85. Greene additionally alleged that Ablon had infringed on the copyright in a book co-authored by Greene and Ablon called <u>Treating Explosive Kids:  The Collaborative Problem Solving Approach</u> ("<u>Treating Explosive Kids</u>"). Finally, Greene alleged that Ablon had "conspired" with co-defendant MGH to permit MGH to use Greene's copyrighted materials "in derogation of [Greene's] copyrights." D. 7 ¶ 84.

The Court in <u>Greene I</u> limited the scope of the Greene's copyright infringement claims, holding that such claims "must be predicated on specific expressions of the CPS Approach, and may not be predicated on the CPS Approach as a concept." 2012 WL 4104792 at *7. The Court

ruled that the CPS Approach concept is not copyright protectable.  Id. at *13.  The Court also rejected Greene's copyright infringement claims based on his presentation slides related to The Explosive Child.  Id. at *8 (holding that "Greene's copyright infringement claim . . . may not be predicated on expressions in the related slide presentations unless those expressions can be traced back to The Explosive Child").  The Court additionally ruled that "Treating Explosive Kids is a joint work."  Id. at *13.[1]  Finally, the Court rejected Greene's copyright "conspiracy" claim.  2012 WL 4104792 at *8-9.

The Court found that "specific expressions of [the CPS] Approach—for example, those found in various editions of The Explosive Child—may be protectable."  Id. at *7.  Given that ruling, the Court must identify the protectable elements of The Explosive Child before Greene's infringement claim can be resolved by the factfinder.  "The extent to which the [copyrighted work] contain[s] protected expression is a matter of law, determined by the court."  T-Peg, Inc. v. Vermont Timber Works, Inc., 459 F.3d 97, 114 n.7 (1st Cir. 2006).  "The process of identifying the unprotected elements of a work and removing them from consideration is sometimes called 'dissection analysis.'"  Hassett v. Hasselbeck, 757 F. Supp. 2d 73, 81 (D. Mass. 2010) (citing Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 34 (1st Cir. 2001)).  Greene and Ablon agree that the Court must engage in this dissection analysis before the remainder of Greene's copyright claims in this case proceed to trial.  Jt. Memo., D. 154 at 3, 6.

## II.     Discussion

### A.     The Court Must Perform a "Dissection" Analysis

For a plaintiff to succeed on his claim of copyright infringement, he must show "ownership of a valid copyright and copying of constituent elements of the work that are

---

[1] The Court did not resolve as a matter of summary judgment whether Treating Explosive Kids is a derivative work of The Explosive Child.  Greene I, 2012 WL 4104792 at *10.

original." <u>Feist Publ'ns Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).  To satisfy <u>Feist</u>'s

"copying" requirement, the plaintiff must prove "actual copying and actionable copying."

<u>Johnson v. Gordon</u>, 409 F.3d 12, 20 (1st Cir. 2005).  To determine if copying if actionable, the

question presented to the factfinder is whether two works appear "substantially similar" to the

"ordinary observer."  <u>T-Peg, Inc.</u>, 459 F.3d at 112.  This means that an "ordinary observer, upon

examination of the two works, would 'conclude that the defendant unlawfully appropriated the

plaintiff's protectable expression.'"  <u>Id.</u> (quoting <u>Johnson</u>, 409 F.3d at 18).  The challenge now

before the Court in this case is to identify Greene's "protectable expression," if any, in <u>The

Explosive Child</u>.

     "The mere fact that a work is copyrighted does not mean that every element of the work

may be protected.  Originality remains the <u>sine qua non</u> of copyright. . . ."  <u>Johnson</u>, 409 F.3d at

19 (quoting <u>Feist</u>, 499 U.S. at 348).  Thus, before the plaintiff may present his claim to the

factfinder, the Court must first determine what aspects of a work constitute original protected

expression.  <u>T-Peg, Inc.</u>, 459 F.3d at 114 n.7 (noting that "[t]he extent to which the [copyrighted

work] contain[s] protected expression is a matter of law, determined by the court. Once this

determination is made, the question of whether two works are substantially similar (and

corresponding application of the ordinary observer test) is a matter for the trier of fact unless

summary judgment is proper") (quoting <u>Yankee Candle</u>, 259 F.3d at 34 n.5).  "Typically, to

properly conduct this examination, a court must 'dissect[ ] the copyrighted work and separat[e]

its original expressive elements from its unprotected content,' honing in solely on the unique

(and thus protected) components."  <u>Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory</u>,

689 F.3d 29, 50 (1st Cir. 2012) (quoting <u>Coquico, Inc. v. Rodríguez-Miranda</u>, 562 F.3d 62, 68

(1st Cir. 2009)).  The point of the dissection test is "to identify those aspects of the expression

that are not necessarily mandated by the idea it embodies." <u>Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 608 (1st Cir. 1988).[2]

The Court is aware of the balance it must strike in conducting its dissection analysis. A dissection that is too broad may sweep in elements that are not protected. Then, when the factfinder is charged with "assessing whether substantial similarity exists, [if] such an impression flows from similarities as to elements that are not themselves copyrightable, it will not satisfy the predicate requirement of originality necessary to ground a finding of actionable copying." <u>Johnson</u>, 409 F.3d at 19; <u>see</u> <u>Soc'y of Holy Transfiguration Monastery, Inc.</u>, 689 F.3d at 51 (noting that "should a work's appearance of similarity rest upon elements that are not themselves copyrightable, this will drive a problematic stake through an infringement claim").

Conversely, "a court should be careful not to over-dissect the plaintiff's work, causing it to ignore the plaintiff's protectable expression." <u>Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC</u>, 560 F.3d 53, 59 (1st Cir. 2009). The Court must not "so dissect the work as to classify all its elements as unprotectable [simply due to the process] thereby possibly blinding it [and the factfinder] to the expressiveness of their ensemble." <u>CMM Cable Rep, Inc. v. Ocean Coast</u>

---

[2] The First Circuit has not defined a specific procedure per se that a court must employ when conducting a dissection analysis, but it provides examples of good dissections, <u>see, e.g.</u>, <u>Soc'y of Holy Transformation Monastery, Inc.</u>, 689 F.3d at 51 (noting that "[w]e are not convinced that . . . a deeper dissection analysis was warranted"); <u>Yankee Candle</u>, 259 F.3d at 34 (stating that to dissect "what aspects of the Yankee labels are protected under copyright law, we follow essentially the same path as did the district court"). The procedural mechanics undertaken by a court to perform a dissection almost certainly depend on the type of work under consideration. Ultimately, the result of the dissection procedure must be to isolate protectable elements of a work so that a factfinder may then properly assess substantial similarity "by comparing the protected elements of the plaintiff's work as a whole against the defendant's work." <u>Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC</u>, 560 F.3d 53, 59 (1st Cir. 2009). This Court finds the dissection approach taken by the judge in <u>Hassett</u>, 757 F. Supp. 2d at 81-90 (performing dissection of a book), to be a useful guide, noting of course that the court in that case went on to perform the substantial similarity test itself in the context of a summary judgment motion.

Props., Inc., 97 F.3d 1504, 1519 (1st Cir. 1996) (internal quotation omitted); see Hassett, 757 F. Supp. 2d at 81 (quoting Coquico, 562 F.3d at 68 (noting that "the court should not lose sight of the forest for the trees; that is, it should take pains not to focus too intently on particular unprotected elements at the expense of a work's overall protected expression")).

As just stated, "copyright law protects original expressions of ideas but it does not safeguard either the ideas themselves or banal expressions of them." Johnson, 409 F.3d at 19. At the same time, copyright law's originality requirement is not a novelty requirement. Situation Mgmt. Sys., Inc., 560 F.3d at 60. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. [T]he requisite level of creativity is extremely low; even a slight amount will suffice." Id. (quoting Feist, 499 U.S. at 345). "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). Courts have developed various doctrines for deciding what is, or what is not, protected expression. Examples that are relevant here include the "merger" doctrine, which denies protection to an expression "[w]hen there is essentially only one way to express an idea. [Where] the idea and its expression are inseparable[, ] copyright is no bar to copying that expression. [Even] [w]hen the idea and its expression are not completely inseparable, there may still be only a limited number of ways of expressing the idea." Soc'y of Holy Transfiguration Monastery, Inc., 689 F.3d at 53 (quoting Yankee Candle, 256 F.3d at 36). Similarly, under the doctrine of "scenes a faire," the Court must not include "elements of a work that are for all practical purposes indispensable, or at least customary, in the treatment of a given subject

matter." <u>Coquico</u>, 562 F.3d at 68.  Additionally, the First Circuit has "generally recognized that short phrases may not be subject to copyrightability [but] applicability of this law very much turns on the specific short phrases at issue, as not all short phrases will automatically be deemed uncopyrightable."  <u>Soc'y of Holy Transfiguration Monastery, Inc.</u>, 689 F.3d 29 at 52 (internal citations omitted).

**B.      The Court's Dissection Analysis of *The Explosive Child***

Green and Ablon have provided extensive briefing to the Court on dissection—i.e., what portions of Greene's expression are copyright protectable.  D. 58-71, 77-79, 84-87, 154.  Greene alleges that Ablon infringed both the 2005 and 2010 editions of the book. D. 84 at 17 & n.29. The Court focused its attention on the 2005 edition of <u>The Explosive Child</u>, as Greene did in his filings.[3]  The Court finds that the key document informing its dissection analysis, in light of its decision in <u>Greene I</u>, is Greene's filing that compares the alleged protected expression in <u>The Explosive Child</u> to Ablon's allegedly infringing workshop presentation materials ("Workshop Materials").  D. 84 Exh. 4 (hereinafter "Exh. 4").[4]  In the first column of this filing Greene

---

[3]  Greene has conceded that "[t]he 2010 edition of <u>The Explosive Child</u> is merely a subsequent edition of the 2005 edition.  Most of the content in the 2010 edition is identical or substantially similar to the content in the 2005 edition." D. 84 at 17 & n.29.

[4]  D. 84 Exh. 4 (referred to as Exhibit D in Greene's dissection memorandum) is a 74-page table consisting of 98 rows and 4 columns that compares <u>The Explosive Child</u>, Exh. 5PWD, D. 60, with Ablon's workshop materials, Exhs. 16DW, D. 63-1; 14DW, D. 62-5; 12D, D. 62-3. The four columns are titled (1) "Text from 2005 Edition of <u>The Explosive Child</u>"; (2) "Plaintiff's Workshop Materials"; (3) "Defendant's Workshop Materials"; and (4) "Infringe Code."  In the first column, Greene lists specific sentence fragments, sentences, and paragraphs from <u>The Explosive Child</u>.  In <u>Greene I</u>, the Court held that Greene's workshop materials listed in the second column do not contain protectable expression independent from <u>The Explosive Child</u>, 2012 WL 4104792 at *8, and so the Court now disregards the second column.  In the third column, Greene lists specific sentence fragments, sentences, and paragraphs from Ablon's workshop materials that Greene alleges were copied from <u>The Explosive Child</u>.  In the fourth column, Greene assigns an "infringement code" where Greene opines if a particular example of Ablon's workshop materials "[i]nfringes concept(s), . . . [i]nfringes text [and is] substantially similar [and/or] [i]nfringes text [and is] verbatim."  In Exhibit 4, Greene makes reference to

identifies what he believes are the "protected elements" of <u>The Explosive Child</u>, and he asks for a ruling that "all of the expression set forth" in that book "is copyright protectable expression." D. 154 at 3.[5]  It is here where the Court focuses its attention to determine if there are protectable elements since it is here that Greene himself identifies the alleged protected expression. Although the Court considered <u>The Explosive Child</u> as a whole, which appears in the record at D. 60 <u>et seq.</u>, in conducting its analysis, it necessarily focused on the allegedly protectable expression that Greene identified in his chart in conducting its own independent comparison of the works at issue.[6]  <u>See</u> <u>Soc'y of Holy Transfiguration Monastery Inc.</u>, 689 F.3d at 52 (noting that "[j]udges are not mindreaders.  To properly assess whether the alleged short phrases are subject to protection, we must know what they are").

---

[5] alleged expression in the book that infringes "concepts" as opposed to the text.  Exh. 4 ("infringe code key").  As this Court previously ruled, 2012 WL 4104792 at *13, there is no copyright protection in the idea of the CPS Approach, but there is protection for, as discussed further below, the expression of same.

[5] Between the first and second rounds of briefing by the parties on dissection, and prior to the Court's ruling on the summary judgment motions, Ablon took the position that Greene's book, <u>The Explosive Child</u>, was copyrightable material, and any dissection analysis should be based upon the book and not Greene's other materials.  D. 77 at 12-26.  In the second round of briefing, Greene submitted a comparison chart of the text of his book to Ablon's workshop material.  Exh. 4.  In light of the Court's ruling in <u>Greene I</u> that <u>The Explosive Child</u> may contain protected expression, the Court now relies on Greene's chart, Exh. 4, to perform its dissection analysis and refers to the 98 numbered items.  Since there is a fair amount of repetition in the chart in regard to alleged protected expression from <u>The Explosive Child</u>, the Court addresses the first instance of each repeated expression, and then cites to the record to identify repeated references of the same (or similar) expression.

[6] The Court recites and discusses the passages that Greene points to in Exh. 4, but it reviewed and considered them in the context in which they appeared in the book.  <u>Yankee Candle</u>, 259 F.3d at 34 (quoting <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1215 (11th Cir. 2000)) (noting that "[a]s long as the analysis is not overly detached and technical, it can adequately assess both the effect of the protected, original elements of [the work] and the contribution of those elements to the work as a whole").

To begin, The Explosive Child is a book that explains a collaborative approach to dealing with "explosive children."[7]   Its intended audience is parents, teachers and other caregivers. Accordingly, it's written in a style and language that is accessible to a lay audience, contains practical steps, easily understood analogies interspersed with vignettes illustrating less efficient methods of parents responding to explosive children and, as Greene explains in the book, the more effective and productive use of a collaborative problem solving approach.   The Court finds here that the alleged "protected elements" identified by Greene contain both protected expressions and unprotected information.   From the 98 items provided by Greene, and through the Court's own analysis of The Explosive Child, the Court now extracts representative examples of items that are unprotected ideas, unprotected fragmented words and phrases, unprotected facts and protected expression.   See e.g., Hassett, 757 F. Supp. 2d at 82-91.

    1.  *Unprotected Facts/Ideas*

There are few sections of The Explosive Child that Greene points to that are not protectable expression, but the statement of (unprotected) facts or ideas, namely "conventional wisdom" about prior behavioral approaches to challenging children:

> *a.* "…the conventional wisdom—is what can generically be referred to as the standard behavior management approach.   There are a few central beliefs associated with this approach.   The first is that somewhere along the line, noncompliant children have learned that their tantrums, explosions, swearing, screaming, and destructiveness bring them attention or help them get their way by coercing or convincing their parents to 'give in.'" Exh. 4, ##3, 70.

> *b.* "explosions are actually highly predictable."   Exh. 4, ##21, 28, 42, 52, 83, 89.

---

[7] In short, The Explosive Child defines explosive children as those who are deficient in the skills of flexibility and frustration toleration and have delayed development in social skills. As a result, they have explosive outbursts in circumstances that other children would not.

The first passage merely recites the tenets of conventional behavioral approaches and their manifestations in parenting roles and, in context of the book overall, sets up the backdrop against which the author lays out his approach.  D. 60 at 90-91.  Like the recitation of scientific or medical fact, the recitation of the traditional behavioral approach to difficult kids is an unprotected element.  The second statement similarly simply is an idea that the outbursts of explosive children are highly predictable.  Although this idea of the outbursts actually being predictable may be an original one, the expression of it is not.[8]

### 2.   *Unprotected Fragmented Words & Phrases*

"It is axiomatic that copyright law denies protection to 'fragmentary words or phrases,' in part because they do not involve an appreciable amount of text or the minimal level of creativity necessary to warrant copyright protection."  Hassett, 757 F. Supp. 2d at 86 (internal quotations and citation omitted).  That is, a short phrase may be subject to copyright protection if it reflects sufficient creativity.  Soc'y of Holy Transfiguration Monastery, Inc., 689 F.3d at 52, and cases cited.  "As so often is the case, context matters."  Id.  However, even in context, there are a few fragmented words and phrases that Greene identifies that do not warrant protection:

> *a.*   "Let's examine the role of three specific language skills categorizing and expressing emotions, identifying and articulating one's needs, and solving problems—to elucidate why this might be," Exh. 4, ##14-17, 79.

---

[8] There is also a plausible argument that this second passage is not protectable because of the "merger" doctrine.  There is no copyright protection for an idea that can only be expressed in one way such that the idea and expression have merged into an inseparable, singular component. Soc'y of Holy Transfiguration Monastery, Inc., 689 F.3d at 53 (quoting Yankee Candle, 256 F.3d at 36).  For example, the First Circuit invoked the merger doctrine where the allegedly protected expression was a "realistic-looking life size deer."  Yankee Candle, 256 F.3d at 36 (citing Concrete Mach. Co., 843 F.2d at 607); see Coquico, 562 F.3d at 68 (noting that copyright protection does not protect "characteristics [that] are ineluctably and inextricably intertwined with the idea").  Applying either doctrine, this passage does not constitute original expression.

     *b.*  "If you're talking about the true meaning of the word cooperate—'to collaborate, to come together . . . ." Exh. 4, ##22, 43.

The first phrase is a transitional phrase, not exhibiting creativity in the expression of ideas, while the last passage is the statement of the meaning of a commonly understood word. Neither category of phrase is sufficiently creative so as to warrant protection.

     *3.*    *Protected Expression*

It is against the backdrop of the overall context of the book that the Court concludes that <u>The Explosive Child</u> does contain protected expression. The idea itself—i.e., a collaborative approach can help explosive children and their parents cope—is not protectable as the Court has previously ruled. However, the expression of that overarching idea and the ideas that support that idea is expressed in various passages of the book:

     *a.*  *Pitfalls of "Consequences" as an Approach to Explosive Children*

[Unfortunately, we live in a society in which many adults, when faced with a child who isn't meeting expectations, can think of only one word: Consequences.] That's a shame, because there are only two ways in which consequences are actually useful: (1) to teach basic lessons about right from wrong . . . and (2) to motivate people to behave appropriately. But it's a very safe bet that your child already knows you don't want him to hit swear, or explode, so it wouldn't make a great deal of sense to spend a lot of time using consequences to teach him something he already knows. And—this may be a little harder to believe—[9]it's also a safe bet that your child is already motivated not to make himself and those around him miserable, so it wouldn't make a great deal of sense to spend a lot of time using consequences to give him the incentive to do well. Children do well if they can. If your child could do well, he would.

Exh. 4, ##5, 44, 45, 84; <u>see</u> Exh. 4, ##1, 34-35, 67 (reciting title of Chapter 2, "Children Do Well If They Can").

The problem is that a very different philosophy—Children do well if they want to—often guides adults' thinking in their interactions with explosive children. Adherents to this idea believe children are already capable of behaving more appropriately but simply don't want to. Any why don't they want to? The knee-jerk explanation—even among

---

     [9] As written in <u>The Explosive Child</u>, D. 60 at 97. Where, as here, entries in Exh. 4 differ from the actual text in <u>The Explosive Child</u>, the Court quotes the correct text found in the book.

many well-intentioned mental health professionals—is that their parents are poor disciplinarians.  Of course this explanation doesn't help us understand why many of the siblings of explosive children are actually very well behaved.  But, as you'd expect, this philosophy and explanation lead to interventions aimed at making children want to do well and helping parents become more effective disciplinarians, typically through implementation of popular reward and punishment programs.

Exh. 4, ##4, 71.

Both of these passages concern the idea that the traditional approaches of discipline (and a child's expected behavior in response to same) do not aid explosive children.  The idea that discipline does not work for every child can be expressed in different ways.  Certainly, the expression in terms of "consequences" and the shorthand of contrasting the underlying tenet of the disciplinary approach ("children do well if they want to") to the collaborative problem solving approach that recognizes explosive children often lack the skills to behave appropriately ("children do well if they can") is original expression.  D. 60 at 28.

### b. Describing the Explosive Child

Don't forget:  Just as a child with a reading disability won't begin reading overnight, a child explosive or not who has difficulty recognizing, expressing, or describing frustration won't begin using his new vocabulary over night.  There's no quick fix.

 Exh. 4, #7, 39, 88; <u>see</u> Exh. 4, ## 37, 72.

Some children, for example, have trouble expressing the fact that they're frustrated.  In other words, they lack a basic vocabulary of feeling words, so they don't have the words to tell you that they're frustrated.  Instead, they swear or hit or destroy things.  So if a child is lacking a basic vocabulary of feeling words, there's only one thing to do:  Teach him a basic vocabulary of feeling words, starting[10] with *happy*, *sad*, and, of course, *frustrated*.

Exh. 4, ##14-17 (2nd half), 66, 79 (2nd half) (emphasis in original).

Explosive children may have a limited repertoire of responses and end up applying the identical responses (giggling, poking, intruding)[11] to situations in which such responses are inappropriate . . . .

---

[10] As written in <u>The Explosive Child</u>, D. 60 Exh. 1 at 99.

[11] As written in <u>The Explosive Child</u>, D. 60 at 61.

Exh. 4, #77.

> So there are a lot of kids out there who are notorious for putting their "worst foot forward." Many of these disorganized, impulsive kids evidence a pattern called reflexive negativity.

Exh. 4, #78.

> We won't cover all of the above skills, but let's sample a few, starting with accurately interpreting social cues. Some kids trip into some very automatic but inaccurate interpretations of their experiences and the intentions of others, including "It's not fair?" "You always blame me" "Nobody likes me" and "I am stupid." These interpretations can cause spontaneous combustion if left unattended.

Exh. 4, #82.

The idea that there are certain children who prone to an "explosive outburst" (expressed here as "occur[ring] when the cognitive demands being placed upon a person outstrip that person's capacity to respond adaptively," Exh. 4, ##6, 38, 73) is expressed in original, creative terms of their deficiency in appropriate language ("basic vocabulary of feeling words"), appropriate responses ("limited repertoire of responses"), inability to read social cues ("trip into some very inaccurate interpretations of their experiences and the intentions of others") and analysis to children with another, more readily discernible disability (e.g., reading disability). D. 60 at 30-31, 34, 48; D. 60 Exh. 1 at 100-01.

### c. Gray Thinking

> As children develop, they learn that, in fact, most things in life are 'gray': There are exceptions to the rule and alternative ways of interpreting things. We don't go home from Grandma's house the same way every time; we don't eat dinner at the exact same time every day; and the weather doesn't always cooperate with our plans. Unfortunately, for some children, gray thinking doesn't develop as readily as we might wish. Though they are often diagnosed with disorders such as nonverbal learning disability or Asperger's disorder, these children can best be thought of as 'black-and-white thinkers stuck in a gray world.' They often have significant difficulty approaching the world in a flexible, adaptable way and become extremely frustrated when events don't proceed as they had originally configured. More specifically, these children often have a strong preference for predictability and routines, and struggle when events are unpredictable,

uncertain, and ambiguous. These are the kids who run into trouble when they need to adjust or reconfigure their expectations, tend to overfocus on facts and details, and often have trouble recognizing the obvious or 'seeing the big picture.' In practical terms, this is the child who may insist on going out for recess at a certain time on a given day because it is the time the class 'always goes out' for recess, failing to take into account both the likely consequences of insisting on the original plan of action (e.g., being at recess alone)[12] and important conditions, an assembly, perhaps, that would suggest the need for an adaptation in plan.

Exh. 4, ##19, 80.

[T]he different social skills that contribute to a child's capacity for flexibility and frustration toleration were reviewed, including attending to appropriate social cues and nuances; accurately interpreting those cues; connecting cues with past experience; having a broad repertoire of responses; and recognizing how they're coming across and appreciating how their behavior is affecting others.

Exh. 4, ##20, 81.

Here, the idea is that explosive children suffer from an inflexibility of thought makes it difficult to adjust to transactions, routines or the ambiguity that is inherent in everyday interaction with others. This idea could be expressed in many ways; the original expression here is as "gray thinking" and its meaning. D. 60 at 58.

As The Explosive Child explains, a parent's view of his/her child's behavior will lead to the type of approach the parent takes in addressing this behavior. Greene argues that the phrase, *"your explanation guides your intervention"* constitutes original expression and is protectable. Although he does not provide the context for it in Exhibit 4, it appears in the following passage in the book:

There's a big difference between viewing explosive behavior as the result of the failure to progress developmentally and viewing it as learned, planned, intentional, goal-oriented, and purposeful. That's because your interpretation of a child's explosive behavior will be closely linked to how you try to change this behavior. In other words, *your explanation guides your intervention.*

---

[12] As written in The Explosive Child, D. 60 at 59.

This them is worth thinking about for a moment.  If you interpret a child's behavior as planned, intentional, goal-oriented, and purposeful, then labels such as "stubborn," "willful," intransigent," manipulative," "bratty," "attention-seeking," "controlling," resistant," "unmotivated," "out of control," and "defiant" will sound perfectly reasonable to you, and popular strategies aimed at motivating compliant behavior and "teaching the child who's boss" will make perfect sense.  If this has been your explanation of your child's explosive behavior, you're not alone.  You're also not alone if this explanation and the interventions that flow from it haven't led you to a productive outcome.

D.60 at 59-60 (emphasis in original).  Although the phrase "your explanation guides your intervention" may not seem like a novel expression, such is not required for copyright protection.  Only originality, a minimal level of creativity, is required.  Situation Mgmt. Sys., Inc., 560 F.3d at 60.  This shorthand expression—to convey the larger meaning that an appropriate (or inappropriate) understanding of an explosive child's behavior will lead to an appropriate (or inappropriate) intervention meets that standard of originality.

> c.  *What Leads to Explosive Behavior and Approaches to Handling Such Behavior*

Considerable portions of The Explosive Child are devoted to the causes of explosive behavior and the approaches for caregivers to take when explosive behavior occurs.  The idea that there are identifiable causes of such behavior and a range of approaches to dealing with same is expressed in original form here.  The causes are "pathways" (defined here as skills that need to be learned) and "triggers" (defined here as problems that have yet to be solved).  Exh. 4, ##8, 13, 18, 41, 75; D. 60 at 40, 63.  That there is a cause (the laundry list of "executive skills, language processing skills, emotion regulation skills, cognitive flexibility skills and social skills" that the explosive child is lacking, see Exh. 4, ##9-13, 76) and effect, and an approach to dealing with that effect is an idea, but it has found original expression here.

Similarly, although the Court has ruled that the idea or concept of the CPS Approach is not itself protectable, the expression of that idea is protectable and is expressed at length in The

Explosive Child.   The CPS Approach of "engaging the child in a discussion in which the problem or unmet expectation is resolved in a mutually satisfactory manner," identified as "Plan B" in the book (in contrast to "Plan A" which "refers to handling a problem or unmet expectation through the imposition of adult will" and "Plan C" which "involves dropping the expectation completely, at least for now").   Exh. 4, ##23-27, 46-49, 85-87; D. 60 Exh. 1 at 1 et seq.

Perhaps, the bare bones recitation of the process or steps of the CPS Approach—1. Empathy plus Reassurance; 2. Define the Problem and 3. Invitation—is not in and of itself protectable, but it finds original expression here.   The discussions of Plan B in The Explosive Child are too voluminous to recite here, but constitute protectable expression.   See, e.g., Exh. 4, ##29, 31-33, 50-53, 55-58, 60-61, 64, 85-87, 90-92, 94-95, 98.   Here are some representative samples:

> There are two ways to do Plan B:  Emergency Plan B and Proactive Plan B.  On first hearing about Plan B, many folks come to the erroneous conclusion that the best time to use Plan B is just as a child is becoming frustrated.  That's Emergency Plan B, and it's actually not the best timing because the child is already getting heated up.  Few of us do our clearest thinking when we're heated up.  As discussed earlier, most explosions are highly predictable.  Thus, there's no reason to wait until the child gets heated up yet again to try to solve the problem that's been causing explosions for a very long time.  The goal is to get the problem solved proactively—before it comes up again.  That's Proactive Plan B.

Exh. 4, ##29, 53, 90-91. Another example is the book's discussion of step one of Plan B:

> Empathy also ensures that your child's concern is on the table.  Just like adults, kids have legitimate concerns:  hunger, fatigue, fears, a desire to buy or do certain things, a desire to be less hot or less cold, and so forth.  Sadly, most kids are accustomed to having their concerns blown off the table by adults who have concerns of their own.  It's not exactly clear why you'd want to blow any child's concern off the table, but it should be crystal clear why you wouldn't want to do it with an explosive child.  You don't lose any authority by empathizing.  But you do keep him calm and enter his concern into consideration.

Exh. 4, ##59, 93, and step two of Plan B:

It is in the second step of Plan B that the adult places his or her concern on the table.  We call this the Define the Problem step because we define a problem simply as two concerns that have yet to be reconciled:  your child's and yours.  Plan B is the only approach to problems or unmet expectations where there are two concerns on the table.  If the only concern on the table is the Adult's concern, you're using Plan A.  If the only concern on the table is the Child's, you're using Plan C.  If both concerns are on the table, you're using Plan B.

Exh. 4, ##32, 60, 94, and step three of Plan B:

The third step of Plan B entails having the child and adult brainstorm potential solutions to the problem that has now been defined by their respective concerns.  This step is called the invitation because the adult is actually inviting the child to solve the problem collaboratively by saying something like, "Let's think about how we can solve this problem" or "Let's think about how we can work that out."  The Invitation lets the child know that solving the problem is something you're doing *with*[13] him—in other words, together—rather than *to* him.

Exh. 4, ##33, 62, 95 (emphasis in original).  The book also describes the core of Plan B (an "ingenious solution," i.e., "[a]ny solution that is doable (by both parties), realistic and mutually satisfactory."  Exh. 4, ##63, 97; D. 60-1 at 19) and the role that the parent takes in Plan B ("You're the surrogate frontal lobe—make sure he takes a moment to consider whether he can actually do what he's agreeing to do," Exh. 4, ##30, 54-55).  All of these examples constitute original protected expressions of the CPS approach.  See Greene I, 2012 WL 4104792 at *7 (holding that while "the CPS Approach itself is not protectable[,] specific expressions of that Approach—for example, those found in various editions of The Explosive Child—may be protectable").

### d.   Engaging the Child in Collaborative Problem Solving

The discussion of the final step of Plan B, the invitation to engage in problem solving collaboration (and the crucial role the child plays in that collaboration) is expressed here:

---

[13] As written in The Explosive Child, D. 60 Exh. 1 at 18.

[I]f your child is unable to think of any solutions, that's a clear sign that he's, well, having trouble thinking of solutions.  Of course, it could be a sign that you've never given him the chance to think of solutions.  So it's possible that your child's skills in this area are better than you think.  If his solution-generating skills aren't so hot, it's possible that they will improve simply by hearing you propose potential solutions numerous times.  But some kids truly don't have the slightest idea where to start when it comes to thinking of solutions.  So let's give them an idea of where to start.  Hard to believe, but it turns out that the vast majority of solutions to problems encountered by human beings fall into one of three general categories:  *(1) ask for help*; *(2) meet halfway/give a little*; and *(3) do it a different way*.  These categories can be very helpful to children whose pathways are in the language-processing domain, for they simplify the language of problem solving and can be taught through pictures (if words are too cumbersome).[14]

Exh. 4, #65 (emphasis in original).  The book also advises:  "So, as it relates to solving problems with your child, here's an important theme:  *Don't be a genius*."  Exh. 4, #96 (emphasis in original).[15]  That an explosive child can be engaged by  a parent in problem solving to avoid or defuse explosive outbursts, and that the actual solution to a problem may be a simple one finds original expression here.

        **C.**        **The Effect of *Treating Explosive Kids* on the Dissection of *The Explosive Child***

In Greene I, the Court ruled, inter alia, that Treating Explosive Kids, published in 2006, was a joint work by Greene and Ablon.  2012 WL 4104792 at *13.  In the wake of this decision, Ablon has taken the position that any dissection analysis must exclude any expression in The Explosive Child that later appeared in the joint work of Treating Explosive Kids because Ablon cannot be liable to Greene for any claim of copyright infringement arising out of his use of the material in the latter book.  D. 154 at 5-6; D. 159 at 3-4.

Treating Explosive Kids appears in the record at D. 78 Exhs. 1-3.  Unlike The Explosive Child that was intended for a lay audience, Treating Explosive Kids is intended for a professional audience of therapists and clinicians.  It begins, unlike The Explosive Child, with a scholarly and

---

[14] As written in The Explosive Child, D. 60 Exh. 1 at 94.

[15] As written in The Explosive Child, D. 60 Exh. 1 at 19.

heavily cited discussion of different models of parenting theories and practices. (Chapter 1). Although many of the terms originally defined in <u>The Explosive Child</u> appear in <u>Treating Explosive Kids</u>—e.g., pathways, triggers and Plans A, B and C (Chapters 2 through 4), the discussion in this book goes beyond the basics of the material in <u>The Explosive Child</u>. For example, <u>Treating Explosive Kids</u> focuses on the skill development that can be implemented for children using Plan B, working with families in a therapeutic setting and implementing the CPS Approach in schools where the default model for dealing with explosive children has been a disciplinary model and implementations of the CPS approach in "restrictive therapeutic settings" (e.g., residential treatment programs, etc.). (Chapters 5 through 8). Although <u>Treating Explosive Kids</u>, like <u>The Explosive Child</u>, includes instructive vignettes, most involve a therapist and parent and/or and all are intended to be instructive to this professional audience and not the lay audience targeted by <u>The Explosive Child</u>. Significantly, the expressions of the collaborative problem solving approach and its related terms are different in <u>Treating Explosive Kids</u>, which is perhaps not surprising given the difference in intended audience. For example, the Court notes the contrast between the introduction of Plans A, B and C in <u>The Explosive Child</u>:

> There are basically three ways to handle a problem or unmet expectation with a child. We used to call these options the three 'baskets.' . . . Now we can them Plans, as in Plan A, Plan B, and Plan C. It's important to emphasize that the Plans come into play only when there is a problem or unmet expectation. If your child is meeting an expectation, then you don't need a Plan. . . .

> Many people think the terminology "Plan A" refers to the *preferred* plan. Not in this book. In this book Plan A refers to handling a problem or unmet expectation through the *imposition of adult will*. Plan C involves *dropping the expectation completely*, at least for now. And Plan B involves doing the name of the approach—*Collaborative Problem Solving*—and engaging the child in a discussion in which the *problem or unmet expectation is resolved in a mutually satisfactory manner*. If you intend to follow the advice in this book, the Plans are your future. One of them in particular. Let's take a closer look.

D. 60 at 103; D. 60 Exh. 1 at 1 (emphasis in original), and the more explanatory discussion of the

same topic for therapists and clinicians in <u>Treating Explosive Kids</u>:

> While there are myriad ways in which adults respond to problems or unmet expectations
> with children, the plans framework places these options into three basic categories.  The
> first option, known as "Plan A," involves the imposition of adult will . . . in other words,
> adults insisting that their expectations be met.  This is, of course, an extremely popular
> option.  The second option, known as "Plan B," involves engaging the child in a
> collaborative process of problem solving so as to resolve whatever concerns or factors are
> interfering with expectations being met (this option is far less popular but happens to be
> the major focus of this book).  The third option, "Plan C," involves reducing or removing
> expectations, at least temporarily (this is a fairly popular option as well).  All three can be
> effective responses, depending on the needs and capabilities of each child and the goals
> of each adult.  This simple framework is the mechanism by which we help adults begin to
> categorize and reflect upon their own behavior and reevaluate and prioritize expectations
> as we work toward the goals of solving problems, reducing explosive episodes,
> improving adult-child interactions, and training lacking cognitive skills.

D. 78 Exh. 1 at 54; <u>see also</u> D. 78 Exh. 1 at 57-60 ("Goals of Intervention").  The Court similarly

contrasts the expression of the parent's role as a "surrogate frontal lobe" in Plan B in <u>The</u>

<u>Explosive Child</u>:

> Your role when using Plan B is that of *surrogate frontal lobe*.  That is, you're going to be
> doing the thinking for your child that he's currently incapable of doing on his own;
> you're going to serve as his tour guide through frustration.  Here's what a lot of folks
> think when they first contemplate being a surrogate frontal lobe:  Wait a second, my kid's
> going to need a surrogate frontal lobe for the rest of his life?  Actually, the reason you're
> being a surrogate frontal lobe now is so that your child won't need a surrogate frontal
> lobe for the rest of his life.  Once you've taught your child the skills he needs to
> successfully navigate frustrations and demands for flexibility on his own, you're fired.
> Who fired you?  He did.  Why'd he fire you?  Because *children do well if they can.*  Same
> as with any other learning disability.

D. 60 Exh. 1 at 7-8 (emphasis in original), with the description found in <u>Treating Explosive</u>

<u>Kids</u>:

> When introducing Plan B, we often find it useful to tell adults that their role in Plan B is
> that of *surrogate frontal lobe*.  This terminology makes explicit the fact that, in using
> Plan B, adults are going to do the thinking for a child that (at this point in his
> development) he is unable to do for himself.  In the role of surrogate frontal lobe adults
> are accomplishing several important missions:  (1) walking the child through a frustrating
> situation in the present (and thereby preventing explosive episodes in the present); (2)

solving problems routinely precipitating explosive episodes, preferably in a durable way; and (3) after multiple Plan B repetitions, training lacking thinking skills so that the child won't need a surrogate frontal lobe for the rest of his life.

D. 78 Exh. 1 at 63 (emphasis in original).  A similar distinction in tone and expression is evident in the discussion of the distinction between "Emergency Plan B" and "Proactive Plan B" in the two books, first in <u>The Explosive Child</u>:

> There are two ways to do Plan B:  Emergency Plan B and Proactive Plan B.  On first hearing about Plan B, many folks come to the erroneous conclusion that the best time to use Plan B is just as a child is becoming frustrated.  That's Emergency Plan B, and it's actually not the best timing because the child is already getting heated up.  Few of us do our clearest thinking when we're heated up.  As discussed earlier, most explosions are highly predictable.  Thus, there's no reason to wait until the child gets heated up yet again to try to solve the problem that's been causing explosions for a very long time.  The goal is to get the problem solved proactively—before it comes up again.  That's Proactive Plan B.

D. 60 Exh. 1 at 8, and then in <u>Treating Explosive Kids</u>:

> [Following discussion of how "explosive episodes" are "highly predictable"]  Thus, many adults wait until they are in the throes of a (highly predictably) problem before attempting a Plan B dialogue.  We refer to this as "Emergency Plan B" and, because of the heightened emotions characteristic of such moments, this is the least opportune time to attempt to durably solve a problem.  This use of Plan B can be productive as a crisis-intervention or de-escalation tool.  But because explosive episodes are highly predictable, the vast majority of Plan B discussions should be taking place *proactively*, well in advance.  We call this "Proactive Plan B."  It is the therapist's job to identify triggers that precipitate explosive episodes on a routine basis and help adults and children begin to have Proactive Plan B discussions under controlled circumstances (i.e., in the therapist's office) so that, over time, adults feel more confident about having these discussions with the therapist's assistance.

D. 78 Exh. 1 at 63-64 (emphasis in original).  There are numerous other passages in <u>Treating Explosive Kids</u> that use some of the same defined terms and steps to explain Plan B and the CPS Approach.  But the expressions of these ideas are different than in the <u>The Explosive Child</u>.  At first blush at least, such comparison does not appear to lend much credence to Ablon's argument that he can defend against the alleged infringement of <u>The Explosive Child</u> by arguing that the same expression appears in the parties' joint work, <u>Treating Explosive Kids</u>.  The Court,

however, recognizes that although it received extensive briefing on the dissection of <u>The Explosive Child</u> (and does not now invite any more briefing on this issue), it has heard less from the parties regarding Ablon's argument regarding the effect of <u>Treating Explosive Kids</u> being a joint work.  The Court will address this matter in short order with counsel at the December 4, 2012 status conference and in light of the January 14, 2013 trial date.

## III.    Conclusion

After conducting a dissection analysis, the Court concludes that <u>The Explosive Child</u> contains protected expression as discussed above.  Whether there is substantial similarity between these protected expressions and elements of Ablon's workshop materials is a matter for the jury.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge